IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
F I L E D

MAY 1 5 2023

Nathan Ochsner, Clerk of Court

| | |
|---|---|
| In Re:<br>Tehum Care Services, Inc.,<br><br>Debtor. | No: 23-90086 CML<br><br>Chapter 11 |

Adv. 23-3072

Anant Kumar Tripati,

   Plaintiff,

                    Vs

Sara Tirschwell;  Valitas Intermediate Holdings Incorporated, a Delaware Corporation; M2 HoldCo LLC, a Florida Limited Liability Co; M2 LoanCo LLC, a Florida Limited Liability Co; M2 EquityCo LLC, a Florida Limited Liability Co; Becken Petty O'Keefe, a Delaware Corporation; Wexford Health Sources, Inc;  Weber Gallagher Simpson Stapleton Fires & Newby LLP; Jones Skelton Hochuli ; Corizon Inc  Provider ;Quintairos Prieto Wood & Boyer ;Nichole Rowey ;Joseph Scott Conlon ;Renaud Drury Cook Mesaros PA ; Kelly Joan Morrissey ;Diane Boschuweicz ;Betty Ullibari ; Centurion Of Arizona ;Sarah L Barnes ;Broening Oberg Woods & Wilson PC ; Michael E. Gottfried ; Daniel P. Struck Attorney ;Struck Wienke & Love PLC ;Paul Carter ;Daryl Johnson Julia Erwin ;Lori Metcalf ; Evanston Insurance Company; Lexington Insurance Company ;Zurich American Insurance  ;A merican  Zurich Insurance Company ;Columbia Casualty Company ;Scottsdale Insurance Company ; Coverys Specialty Insurance Company ; Hartford  asualty Insurance Company ;Liability Insurers For Weber Gallagher unknown at this time.; Liability Insurers Jones Skelton  unknown at  this  time.;Liability  Insurers  Renaud  Drury    unknown  at  this time.;Liability Insurers Quintairios Prieto  unknown at this time;.Liability Insurers Broening Oberg unknown at this time.;Liability Insurers Struck Wienke unknown at this time.Liability Insurers Gottfried Morrissey Carter unknown at this time

CORRECTED VERIFIED ADVERSARY COMPLAINT  TRIPATI v TEHUM CARE
SERVICES INC   No: 23-90086 (CML) Page **1** of **182**

Defendants.

_____

_____

## CORRECTED VERIFIED ADVERSARY COMPLAINT BY

## ANANT KUMAR TRIPATI

Anant  Kumar Tripati hereinafter "Tripati") files this adversary complaint and declares under the penalty of perjury that these facts are true and correct, and if called in to testify, he shall and will do so:

## TABLE OF CONTENTS

Table Of Contents................................................................... 2

The Attempt To Meet And Confer ........................................... 5

Are Inextricably Entwined ...................................................... 5

The Policy................................................................................ 6

Jurisdiction And Jurisdiction Based On Spoliation ............... 7

Accrual And The Injury I Sustained From The Criminal Enterprise Operated By Corizon As Set Forth Below ................................... 9

CORRECTED VERIFIED ADVERSARY COMPLAINT  TRIPATI v  TEHUM CARE SERVICES INC   No: 23-90086 (CML) Page **2** of **182**

Corizon Has Had A History Of Defrauding Prisoners And Government Entities Nationwide, And Is At It Again Before This Judge, Through Texas Divisional Measures ............................................. 17

What The Former Medical Director Of Corizon, Centurion And Naphcare Has Testified To ........................................................................ 35

How The Scheme To Fraud Designed By Corizon Worked .................. 39

The Defendants Who Are Alter Egos Of Each Other< With Identity Of Interests, With Agreements To Cooperate With Debtor, And Hence Indispensable Parties ........................................................................ 13

The Corporate Veil Must Be Pierced As The Monies That Corizon And Others Misappropriated Is Relevant To The Bankruptcy Filing , By And Through The Abuse Of Texas Law ............................................. 41

The Bankruptcy Does Not Address Spoliation Of Evidence, And The Use Of Bankruptcy To Put A Stop To Te Federal Courts Resolving Spoliation ............................................................................................. 42

Resjudicata And Estoppel Does Not Apply When Through Unlawful Activity And Use Of The Bankruptcy Proceedings, The Process For Judicial Review Has Been Thwarted ....................................................... 43

The Role Of Valitas Is Very Active In Financing Healthcare Entities That Defraud The Community As Is Done By Correctional Healthcare Enterprise ................................................................ 46

A Look At Some Specific Fraudulent Statements Corizon Makes To Coerce Contracts .................................................................... 89

About Corizon Health Corizon According To The Debtor ................... 95

Why Should One Choose Corizon Health Acccording To The Debtor97

Benefits For Choosing   Corizon Health Acccording To The Debtor 98

Vendor Diversity Program (Vdp) Description Per Corizon............... 102

Wexford Health-Corizon Health-Centurion And Haphcare Are All Altregos Of Each Other. Hen One Leaves The Oter Continues With The Scheme .................................................................... 104

Centurion Follows Corizon , Wexford, And Is Preceded By Naphcare Using The Corizon Model ........................................................ 125

Naphcare Follows Centurion Using The Corizon Model.................... 132

The Conspiracy Amongst Defendants To Engage In Spoliation And Then Prevent The Claims From Being Heard ....................................... 145

Allegations Common To All Schemes ...................................... 146

**The Bankruptcy Fraud Scheme By Corizon** ............................................. 147

**The Scheme To Perpetate Fraud By Defendnts** ................................... 150

**The Scheme To Prevent Presentation Of Evidence By Defendants** 156

**The Practices Of Liability Insurers** ......................................................... 165

**The Pattern Of Racketeering Activity** .................................................... 166

**First Claim For Relief** ............................................................................... 169

**Second Claim For Relief** ........................................................................... 173

**Third Claim For Relief** .............................................................................. 176

**Prayer For Relief** ....................................................................................... 179

**COMPLIANCE WITH RULE 11** ........................................................................... 180

## THE ATTEMPT TO MEET AND CONFER

1. Before I filed this adversary complaint, I contacted counsel by letter, and asked him to meet and confer, telephonically. I gave him the contact address for the email. He failed, thereby forcing me to file this complaint.

## ARE INEXTRICABLY ENTWINED

2. The conduct of Defendants are inextricably entwined with the conduct

These claims affect distribution of the Debtor's assets.   Howell Hydrocarbons v Adams, 897 F2d 183 (5th Cir. 1990)

## **THE POLICY**

3. Defendants  in advance of litigation, as a matter of their practice and policy, engineered the scheme to deploy prefabricated defenses in prisoner litigation. They used permissible procedural devises in bad faith, rigging the game from inception. They ensured truthful untainted evidence is not disclosed if inculpatory and favorable to inmates.    They  created  alternative  evidence/facts,  not mischaracterizing them. They assembled template stock pleadings, making false sworn/unsworn statements, providing false incorrect expert/consultant reports, creating false exonerating evidence. They intentionally destroyed, withheld the foregoing material evidence duty bound to disclose, that prisoners like me cannot obtain from alternative sources. These are reports, emails, investigations, faxes, employee misconduct reports, policies, directives, failure to follow policies, and the evidence discussed .

4. Defendants made material misrepresentations as to past and current facts/policies/directives, with knowledge or belief of their falsity, with an intention that courts and inmates shall rely on.  Both the courts

and I relied, and on which there was reasonable reliance by courts and inmates. They lied and concealed the evidence violating fraudulent concealment, fraud, deceit. Their conduct constitutes common law fraud, deceit, fraudulent concealment, constructive fraud, constructive taking, unjust enrichment, breach of fiduciary duty, deceptive business practices, fraud upon the court, and conspiracy to engage in these torts. Their conduct also is a violation of my right of access to courts, as they, by filing this bankruptcy, [prevented the United States Supreme Court, Third, Ninth and Arizona federal courts] from reviewing my claims on spoliation. I would have prevailed had they not filed this bankruptcy, and allowed the courts, to review my claims.

5. Defendants   had a legal obligation to disclose the evidence in connection with existing or pending litigation. They did not disclose material evidence, intentionally withholding, altering, destroying the evidence to disrupt frustrate prisoner litigation. As consequence the evidential record did not contain the relevant evidence.

## JURISDICTION AND JURISDICTION BASED ON SPOLIATION

6. As this is a core proceeding within the meaning of 28 USC §157(b), 28 USC § 1334 confers jurisdiction. 18 USC § 1964(a)(c), 28 USC § 1332,, 28 USC§ 1337, ARS §13-2314.04.A also confer jurisdiction.

7. I did not choose this forum. By filing protection under Chapter 11, Defendants, waived jurisdiction of this court to grant me relief on my claims as they are alter egos of each other, have acted in concert with each other, have abused their corporate form, used the corporate structure as a mere instrumentality for fraud and wrongs against me, as set forth in  this complaint, in Arizona, in this court and other venues.

8. I am a British Citizen born in Fiji and Defendants of Arizona, Tennessee, Pennsylvania, Missouri, and Texas. The amount in controversy, exclusive of interest and costs, exceeds $250,000.

9. The Supreme Court has held when documents have been destroyed, the Plaintiff has been deemed to have established personal jurisdiction. Ins. Corp. v. Compagnie des Bauxites, 456 U.S. 694 (1982) (affirming order that imposed sanction of deeming personal jurisdiction established)

10. I did not choose this forum. By filing protection under Chapter 11, Defendants, waived jurisdiction of this court to grant me relief on my claims as they are alter egos of each other, have acted in concert with each other, have abused their corporate form, used the corporate structure as a mere instrumentality for fraud and wrongs against me,

as set forth in this complaint, in Arizona, in this court and other venues.

11. The corporate structure is a mere instrumentality by Defendants at all times, to perpetrate fraud and engage in racketeering. The mere instrumentality is evidenced by Correctional Health  maintaining a common, same and or similar business structure, policy, using a joint defense in all cases involving prisoners, restructuring in Texas for the purpose of defrauding prisoners and precluding federal courts from reviewing claims of violation of federal rights. Pre-litigation destruction of evidence is a recurring issue which is subject  to sanction under Chambers v. NASCO, Inc., 501 U.S. 32, 35 (1991). Circuit Courts of Appeals are—and have long been---in direct conflict with The Pizarro, 15 U.S. (2 Wheat.) 227 (1817) and its protégé..

12. The first Act occurred after 1970 and the last act, within four years of the prior act.

## ACCRUAL AND THE INJURY I SUSTAINED FROM THE CRIMINAL ENTERPRISE OPERATED BY CORIZON AS SET FORTH BELOW

13. After Corizon notified the Third Circuit of this Bankruptcy, that court in Case 22-1861 on April 13, 2023 abstained as to all Defendants, because the claims in that case, were about spoliation by all

Defendants, and the Third Circuit, District Court, Defendants, failed to address the spoliation. (See Appendix to ECF 261. (This appendix shows that the Third Circuit overlooked this claim, violating Fifth , Third Circuit precedents and U S Supreme Court precedents) see also ECF 244 and 280. )

14. In the District of Arizona, after Defendants filed a notice of this bankruptcy, the District Court, as mandated by law, abstained from ruling on the spoliation as to all Defendants for the reasons above. CIV 18-0066RM.

15. After Defendants notified the Ninth Circuit in 21-15902 of these Bankruptcy proceedings, the Ninth Circuit has not ruled on the matter, it appears, the court has abstained.

16. After I became apprised of this Bankruptcy, I notified the District Court in Arizona in CV 22-0243 JJT JFM of these proceedings, and am amending my complaint, to remove all claims, as to spoliation by here Defendants, for the reasons in 12 above.

17. As such, these spoliation claims, accrued when Defendants notified the courts, and prevented them from deciding the claims, as mandated by law. The Supreme Court Has Held When Documents Have Been Destroyed, The Plaintiff Has Been Deemed To Have Established

CORRECTED VERIFIED ADVERSARY COMPLAINT  TRIPATI v TEHUM CARE SERVICES INC   No: 23-90086 (CML) Page **10** of 182

Personal Jurisdiction. Ins. Corp. V. Compagnie Des Bauxites, 456 U.S. 694 (1982) (Affirming Order That Imposed Sanction Of Deeming Personal Jurisdiction Established)

18. These Defendants have by operation of the federal bankruptcy laws, in effect, transferred the spoliation claims, to this court, against all Defendants. Defendants, and each of them, acting in bad faith, adopted outside the adversarial process the policy to conceal and falsify evidence in prisoner cases, as set forth in this complaint. They concealed and also provided false information as to the electronic evidence that they had in their possession.  Defendants failed to perform their duty to disclose the evidence that they had in their possession. They failed to exercise reasonable care to prevent harm to me during litigation against them. They knew or had reason to know that their misconduct would defeat my claims.

19. As a consequence of the scheme I was unable to have the Third Circuit, Ninth Circuit, District of Arizona, Arizona State courts, review my spoliation claims against Defendants, their agents, employees and subordinates. The attorney and the law firm Defendants devised and implemented a scheme and or  policy outside the adversarial process, to engage in spoliation of evidence in prisoner

cases, which could not be reviewed, because of the bankruptcy filing. As I was a witness in my cases, due to the retaliation against a witness, I was prevented from presenting that evidence, in official proceedings under federal law, in state and federal courts. The liability insurers by making policy exceptions in prisoner cases, allowed Defendants to engage in the misconduct.

20. Defendants deprived me and others of a benefit, defined as anything of value or advantage, present or prospective, under ARS 13-105.5 the tangible evidence or intangible rights to have the court decide my claims on spoliation based on all the evidence, is property within the meaning of ARS 13-105.37, which Defendants deprived me of. All this was accomplished through the system of emails, through computer networks, and the use of the United States Mail.

21. By obstructing justice, acting in a manner to obstruct justice, to influence the due administration of justice, interfering in the administration of justice, with specific intent to corruptly influence, impede or obstruct the administration of justice by implementing the policy of making others lie, as set forth in this complaint, Defendants injured me. They foresaw the evidence was for use in official proceedings for violation of federal rights, satisfying the federal nexus

set forth in United States v Causey, 183 F3d 407(5th Cir. 1999)Their corruption included the concealment of evidence, submission of false statements under penalty of perjury, and making false statements in this bankruptcy and judges deciding federal claims.

## THE DEFENDANTS WHO ARE ALTER EGOS OF EACH OTHER< WITH IDENTITY OF INTERESTS, WITH AGREEMENTS TO COOPERATE WITH DEBTOR, AND HENCE INDISPENSABLE PARTIES

22. Because of their  identity of interests, the cooperation agreements that they have entered into, and as these Defendants are alter egos of each other, they are named as parties. These Defendants were arties, to the spoliation claims in the District and Circuit Courts. Without their joinder, I cannot get complete relief, because, as the Debtor has filed for this bankruptcy, the Circuit Court and District courts have, as required by law, declined to hear my spoliation claims.

23. Sara Tirschwell; 205 Powell Place, Brentwood, TN 37027

24. Valitas   Intermediate   Holdings   Incorporated,   a   Delaware Corporation; 205 Powell Place, Brentwood, TN 37027

25. M2 HoldCo LLC, a Florida Limited Liability Co;   James D. Gassenheimer, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131

26. M2 LoanCo LLC, a Florida Limited Liability Co; James D. Gassenheimer, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131

27. M2 EquityCo LLC, a Florida Limited Liability Co; James D. Gassenheimer, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131

28. Becken Petty O'Keefe, a Delaware Corporation 131 South Dearborn St # 2800, Chicago, IL 60603

29. Wexford Health Sources, Inc; provider 501 Holiday Drive, Pittsburgh, PA 15220 sued individually and offcially

30. Weber Gallagher Simpson Stapleton Fires & Newby LLP; Attorney 2 Gateway Ctr Pittsburgh PA 15222 attorney for Wexford sued individually and offcially

31. Jones Skelton Hochuli Attorney 1 N Central # 900, Phoenix, AZ 85004 sued individually and offcially

32. Corizon Inc Provider 103 Powell # 104, Brentwood, TN 37027

33. Quintairos Prieto Wood & Boyer PA Attorney 8800 E Raintree # 100 Scottsdale, AZ 85260 sued individually and offcially

34. Nichole Rowey Attorney 8800 E Raintree # 100 Scottsdale, AZ 85260 sued individually and offcially

35. Joseph Scott Conlon Attorney 40 N Central # 2700 Phoenix AZ 85004 sued individually and officially

36. Renaud Drury Cook Mesaros PA Attorney    40 N Central # 2700 Phoenix AZ 85004 sued individually and officially

37. Kelly Joan Morrissey Attorney 2005 N Central, Phoenix, AZ 85004 sued individually and officially

38. Diane Boschuweicz SHINNEMPLOYEE 1601 W Jeffferson Phoenix AZ 85007 sued individually and officially

39. Betty Ullibari Paralegal 1601 W Jeffferson Phoenix AZ 85007 sued individually and officially

40. Centurion Of Arizona Porvider 1850 E rio Salado Way, # 209, Tempe, AZ 85284

41. Sarah L Barnes Attorney Attorney 2800 N Central Phoenix AZ 85004 sued individually and officially

42. Broening Oberg Woods & Wilson PC Attorney 2800 N Central Phoenix AZ 85004 sued individually and officially

43. Centurion LLC Provider 7700 Forsythe Blvd St Louis, MO 63105

44. Michael E. Gottfried Attorney 2005 N Central, Phoenix, AZ 85004 sued individually and officially

45. Daniel P. Struck Attorney 3100 W Ray Rd # 300 Chandler, AZ 85226 sued individually and officially

46. Struck Wienke & Love PLC Attorney 3100 W Ray Rd # 300 Chandler, AZ 85226

47. Paul Carter Attorney 416 W Congress # 20 Tucson, AZ 85701 sued individually and officially

48. Daryl Johnson Monitor 1601 W Jeffferson Phoenix AZ 85007 sued individually and officially

49. Julia Erwin Monitor 1601 W Jeffferson Phoenix AZ 85007 sued individually and officially

50. Lori Metcalf Attorney 8800 E Raintree # 100 Scottsdale, AZ 85260 sued individually and offcially

51. Evanston Insurance Company, 10275 W Higgins Rd # 700, Rosemont, IL 60018-6408 is liability Insurer for Wexford.

52. Lexington Insurance Company 99 High Street, Floor 24, Boston MA 02110-2378 is liability Insurer for Corizon

53. Zurich American Insurance  1299 Zurich Way, Schaumburg, IL 60196-1056 Company is liability Insurer for Centurion

54. American  Zurich Insurance Company P.O.Box 968046 Schaumburg, IL 60196-8046 is liability Insurer for Centurion

55. Columbia Casualty Company 151 N Franklin St, Chicago IL 60606-1915 is liability Insurer for Centurion

56. Scottsdale Insurance Company 8877 N gainey Center dr. Scottsdale, AZ 85258 is liability Insurer for Centurion

57. Coverys Specialty Insurance Company 1 Financial Center 13th Floor, Boston MA 02111 is liability Insurer for Centurion

58. Hartford Casualty Insurance Company One Hartford Plaza, Hartford, CT 06155 is liability Insurer for Ullibarri.

59. Liability Insurers For Weber Gallagher  unknown at this time.

60. Liability Insurers Jones Skelton  unknown at this time.

61. Liability Insurers Renaud Drury  unknown at this time.

62. Liability Insurers Quintairios Prieto  unknown at this time.

63. Liability Insurers Broening Oberg unknown at this time.

64. Liability Insurers Struck Wienke unknown at this time.

65. Liability Insurers Gottfried Morrissey Carter unknown at this time.

66. Beecken Petty O'Keefe & Company, 131 South Dearborn St # 2800, Chicago, IL 60603


## CORIZON HAS HAD A HISTORY OF DEFRAUDING PRISONERS AND GOVERNMENT ENTITIES NATIONWIDE, AND IS AT IT AGAIN BEFORE THIS JUDGE, THROUGH TEXAS DIVISIONAL MEASURES

67. In June 2015, it was announced that two of Corizon's  Contracts —

Including Big Loss in New clients, the New York City jail system —
CORRECTED VERIFIED ADVERSARY COMPLAINT  TRIPATI v TEHUM CARE
SERVICES INC  No: 23-90086 (CML) Page **17** of **182**

including Rikers Island – and the Allegheny County Jail in Pennsylvania, would not be renewing their contracts with Corizon to provide medical services to prisoners. In both cases, the contracts were not renewed due to issues related to the company's performance.

68. The jails are at opposite ends of the size spectrum, with Rikers holding approximately 11,000 prisoners and the Allegheny County Jail housing approximately 2,000. Yet Corizon was unable to effectively manage either facility, resulting in the loss of the contracts. Both New York City and Allegheny County chose not to have the contract rebid to any of the other large private medical care providers, such as Centurion, Naphcare or Wexford Health Sources.

69. Additionally, according to an April 2015 news report, "since 2012, Corizon has lost statewide contracts covering 84,000 inmates in Maine, Maryland, Minnesota and Pennsylvania." [See: PLN, March 2014, p.1]. Corizon also lost its contract to provide medical care in Tennessee prisons, while the District of Columbia recently decided not to contract with the company for its jail system and the Florida Department of Corrections is rebidding Corizon's medical care contract following reports of an increasing number of prisoner deaths.

70. On June 10, 2015, New York City Mayor Bill de Blasio announced he would not renew Corizon's contract to provide healthcare at Rikers Island and other city jails; the $126.6 million contract is set to expire on December 31, 2015. According to DNAinfo New York, the company's contracts are actually worth over $400 million. Corizon was awarded a $126.6 million contract for management of medical services in the city's jail system. The city also awarded Correctional Medical Associates of NY (CMA of NY) a $270 million contract to provide health care to jail prisoners, and awarded Correctional Dental Associates of NY (CDA of NY) $8.98 million to provide dental care. CMA of NY has the same corporate address as Brentwood, Tennessee-based Corizon, and prior to 2012, CDA of NY was registered as PHS Dental Services, Inc. PHS, or Prison Health Services, was a predecessor to Corizon. [See: PLN, July 2015, p.1].

71. Corizon (and previously PHS) had provided health care at New York City jails since 2001. According to media reports, Corizon is allegedly responsible for over a dozen prisoner deaths due to inadequate treatment. The most recent contract, which was renewed in 2012, was awarded despite poor performance by the company in prior years. Incredibly, New York City officials agreed to indemnify Corizon from

lawsuits to induce the firm to renew its contract. The New York Times noted that Corey Johnson, a city councilman who held hearings on health care at Rikers in March 2015, said Corizon had been a "failure" and the city's decision to indemnify the company was "unconscionable."

72. Corizon and government officials often note that health care for prisoners is adequate so long as it meets a basic standard of care. At Rikers, even the basic standard was not always met by Corizon. For example, a 20-year-old prisoner who complained of chest pains and difficulty breathing for several days received no treatment for his condition. The prisoner died of a ruptured aorta. In another case, a 32-year-old prisoner complaining of stomach pain and blood in his stools was not given medical care. Only after other prisoners protested did he receive treatment. However, it came too late and the prisoner died from a bacterial infection.

73. The worst case of medical neglect at Rikers may be that of Bradley Ballard. Ballard, a diabetic prisoner with severe schizophrenia, was placed in a segregation cell on a mental observation ward on September 4, 2013 for dancing by himself and folding a T-shirt into the shape of a phallic symbol and waving it at a female guard. Little

did Ballard realize that such simple, non-violent acts would result in his death at the jail.

74. Ballard died a week later on September 11, 2013 after he was deprived of insulin and locked in his cell without food or running water, including a working toilet, for several days. The New York Times noted that a warden, an assistant deputy warden, guards, doctors, mental health clinicians, nurses and other jail employees made at least 57 visits to Ballard's cell as he slowly deteriorated. Despite his worsening condition, staff did nothing to assist him despite the abhorrent stench of urine and feces emitting from his cell.

75. Though guards, doctors and other employees were visibly repulsed by the smell, none would help Ballard. When medical personnel finally arrived to remove Ballard from his cell, they handed two prisoner workers a blanket and gloves and instructed them to go in and get him. The prisoners, covering their faces due to the stench, said later that Ballard tried to move but was unable to stand or walk. After he was placed on a gurney and wheeled into the hallway, the medical staff saw that he had tied a rubber band tightly around his genitals, where it had remained unnoticed until the flesh began rotting.

76. In a subsequent lawsuit filed by Ballard's family, the complaint noted, "Mr. Ballard was clearly on the brink of death, yet he lay neglected on the gurney," and medical staff "held back, unwilling even to touch his body. For an inexcusable period, they continued to stand idly by and do nothing." The complaint also stated that "On June 3, 2014 following an autopsy ... the Medical Examiner declared Mr. Ballard's death a homicide." See: Griffin v. City of New York, U.S.D.C. (S.D. NY), Case No. 1:14-cv-07329-NRB.

77. In June 2015, the New York City Department of Investigations (DOI) released the findings of its review of Corizon's performance. The report focused on mental health clinicians and aides employed by Corizon, and noted alarming gaps in the company's hiring procedures, including criminal background checks. For example, a Corizon records clerk was arrested when he was caught smuggling a straightedge razor into Rikers; investigators from the DOI ran his prints and found he had done a 13-year stint in prison for kidnapping. Another applicant listed as many as 13 prior criminal convictions, but was hired without a detailed explanation regarding the circumstances of the convictions. Other findings by the DOI included failures to adequately check professional licenses, applicant references and prior

employment history. The report criticized Corizon for hiring employees who had few qualifications or did not meet minimum qualifications for mental health aide positions. It also faulted the city's Department of Corrections for requiring the company to obtain fingerprint cards from job applicants but failing to process hundreds of the cards over several years.

78. Corizon's CEO said he "would have preferred to stay in New York," adding, "If at all possible, one day we'd love to get back." After Corizon's contract expiredat the end of the year, medical care for prisoners in New York City's jail system will be provided by the city's public Health and Hospitals Corporation.

79. Following eleven deaths within an 18-month period at the Allegheny County Jail in Pittsburgh, Pennsylvania, county executive Rich Fitzgerald announced that the jail's contract with Corizon would not be renewed after expiring at the end of August 2015.

80. In September 2013, Corizon was awarded a two-year, $23 million contract to provide health care services to prisoners at the Allegheny County Jail. However, problems with the company's performance began almost immediately. A prisoner jumped from a tier at the jail in October 2013 and was severely injured; he was not transported to the

hospital until the following day. Within hours of his transfer, he died at the hospital from injuries sustained in the fall. Early on in the contract there were problems related to the proper and timely distribution of medication to prisoners, lack of adequate recordkeeping procedures, and staffing cuts that resulted in fewer registered nurses, physicians and mental health care personnel.

81. In 2014 the jail recorded seven medical-related deaths, a rate well above the national average for a facility of its size. The inadequate care provided by Corizon resulted in health care workers organizing with the United Steel Workers of America (USW). That process became mired in litigation against Corizon when, in February 2014, a Catholic nun who worked as a registered nurse at the jail was allegedly fired for union organizing activities. Sister Barbara Finch was dismissed after she openly expressed concerns at a meeting regarding patient safety and care. The USW filed an unfair labor complaint against Corizon over Finch's dismissal, and a settlement was eventually reached that allowed her to retain her job. [See: PLN, March 2014, p.1].

82. During the first five months of 2015, four more prisoners died due to health care-related issues. The first was Frank Smart, Jr., 39. Despite

telling staff that he needed his seizure medications, Smart was told he would have to wait a few days. He died within 48 hours of his arrival at the jail; according to a medical examiner's report, his death was caused by a seizure disorder and being "physically restrained in [a] prone position." One of Smart's nine children, Tiara Smart, filed a wrongful death suit against Corizon and the county in Common Pleas Court in July 2015.

83. Allegheny County Controller Chelsa Wagner conducted an audit of Corizon's contract. The audit, released in December 2014, cited 14 areas in which the company allegedly failed to perform contractually-required services, ranging from failure to maintain emergency equipment and inadequate staffing to long delays in providing prisoners with physical exams and medication. [See: PLN, March 2015, p.30].

84. Apparently fed up with the many problems related to Corizon's performance, Allegheny County decided not to renew its contract with the company. As of September 1, 2015, the Allegheny Health Network began providing medical care at the jail.

85. At the El Paso County Jail in Texas, Corizon had held the contract for health care services since 2009. However, county officials began

negotiations with the University of Texas Health System and the Emergence Health Network of El Paso to provide prisoner medical and mental health services at the facility. Corizon's contract expired and the company was granted a six-month extension until December 31, 2015 to continue to provide medical care for prisoners. The expired contract was worth approximately $8 million per year.

86. In Santa Barbara County, California, the county's contract with Corizon expired on June 30, 2015. Although jail officials wanted to renew the contract, county commissioners granted only a 4-month extension, putting the $9.8 million annual contract on hold. At issue was deaths of prisoners at the facility, complaints of understaffing and medication shortages.

87. One of the prisoners who died, Raymond Herrera, 52, was serving 10 days in jail for probation violations. According to a news report, he started having convulsions in his cell in June 2015, then passed out, hit his face against a railing and had another seizure. He was "eventually" taken to a hospital, where he died due to a ruptured spleen caused by cirrhosis of the liver. A local group, Families ACT!, claimed that substandard care by Corizon employees was a contributing factor in Herrera's death.

88. In a June 2015 interview with The Marshall Project, Corizon CEO Dr. Woodrow Myers noted that losing contracts is part of the business. When asked about contract losses at Rikers Island and in Maine, Minnesota, Pennsylvania and Maryland, Myers replied, "It's a lumpy business, you win some, you lose some."

89. That attitude may well describe the outcome of the smaller contracts in Allegheny, El Paso and Santa Barbara counties, but for a company that has had its rating repeatedly downgraded by Moody's, a research and risk assessment agency, the loss of the $400 million Rikers Island contract may be more problematic. In Moody's last downgrade of Corizon's bond rating in August 2014, the agency stated, "The rating action reflects the company's continued operating performance weakness and the further deterioration of credit metrics beyond Moody's previous expectations, attributable to recent contract losses, margin declines from competitive pricing pressure on renewed contracts, and delays in the realization of earnings from certain start-up contracts."

90. A Birmingham, Alabama health care company has taken over medical care at the Washington County jail in Hillsboro, Oregon in the wake of a scathing audit that led county officials to terminate a contract with

Corizon Health two years early. The audit found that a lack of county oversight of the Corizon contract resulted in inadequate prisoner medical care and cost the county hundreds of thousands of dollars.

91. Birmingham-based NaphCare, Inc. assumed control over health care at the jail on June 1, 2015 under a contract to provide services to the approximately 570 prisoners at the facility.

92. "We are eager to embark on this partnership with NaphCare. They are an organization that shares our commitment to value-driven service while providing progressive medical care within our jail," Sheriff Pat Garrett said in a statement.

93. In addition to selecting a new provider for jail health services, county officials stripped the Washington County Department of Health and Human Services of its responsibility for overseeing the contract, instead appointing the county Finance Department to do so.

94. A 34-page report issued by County Auditor John Hutzler in November 2014 deliberately avoided directly evaluating the quality of prisoner healthcare at the jail, instead pointing out inadequacies based on what the audit found in the county's monitoring of the Corizon contract.

95. "Evaluating the quality of care provided to inmates was beyond the scope of this audit, and we express no opinion on the quality of care

provided," the report stated. However, it added, "We did review the processes implemented by the contract administrator to monitor quality of care and concluded they did not provide the County with reasonable assurance that quality care was being provided."

96. News reports published in The Oregonian described lawsuits against the Washington County jail, including one filed by former prisoner Alexander Heap, 34, alleging medical negligence. Heap filed suit in federal court in March 2014 against the county, Corizon and several jail medical workers and guards, claiming he was mistreated during his approximately three-month incarceration at the facility.

97. His complaint alleged the jail had a defective health care policy, and that jail staff and Corizon were negligent and intentionally inflicted emotional distress by denying and delaying medical treatment.

98. "This is not unusual behavior at Washington County jail," the complaint said. "The jail does not give inmates or pretrial detainees medical attention when it is needed, instead ignoring inmates' medical issues." Heap settled his lawsuit with Corizon in February 2015. See: Heap v. Wortham, U.S.D.C. (D. Ore.), Case No. 3:14-cv-00105-ST.

99. In another lawsuit filed in May 2014, former prisoner Marco Antonio Jiminez Ramos claimed he was forced to take the wrong medications

while he was held at the Washington County jail over a five-week period starting in mid-March 2013, which caused a myriad of additional health problems. His lawsuit accused jail officials of violating his Fourth, Eighth and Fourteenth Amendment rights.

100.    "Defendants' unlawful acts and omissions caused plaintiff extensive damages, including vomiting blood, defecating blood, loss of appetite, extreme panic attacks, pain and suffering, humiliation, mental and psychiatric problems, anxiety, nervousness, fear, trauma, emotional distress, paranoia, depression, nightmares, and related serious medical needs," the complaint stated. Ramos settled his suit in December 2014. See: Ramos v. Washington County, U.S.D.C. (D. Ore.), Case No. 3:14-cv-00778-BR.

101.    Instead of citing health care inadequacies directly, Hutzler's audit focused on staffing violations that created inadequate conditions at the jail, using a budgetary analysis to make the point. The audit found that Corizon and jail officials had violated the terms of their contract by failing to properly monitor prisoner health care.

102.    "The contract ... required that all jail healthcare services be reviewed and evaluated for quality of care through established and regularly performed audits," the report stated. "We found no evidence

that these audits had been performed. Although [Corizon] represented that it had a quality assurance program, it did not report the results of its quality assurance audits to the MAC (Medical Audit Committee) or the contract administrator."

103.    Further, Hutzler cited the contract administrator – an individual he later refused to name – for failing to ensure that Corizon kept an adequate number of qualified employees on duty at the jail during all shifts. As a result, the administrator "did not require the contractor to report staffing in sufficient detail to determine whether staffing specifications were met or whether the staffing actually provided was adequate to ensure quality of care."

104.    Consequently, the audit continued, Corizon was paid for health care services it did not provide. "We estimate the value of the minimum specified staffing that the county didn't receive between July 1, 2008, and June 30, 2012, to be at least $350,000," Hutzler wrote. The county was forced to pay additional costs for outside medical care when Corizon staffers were not on duty.

105.    "Failing to enforce minimum staffing requirements may also have increased other County costs for jail healthcare," the audit stated. When the Medical Director's hours dropped more than five hours

below what was required by the contract, "the average number of referrals to external physicians was 42% higher, and the average number of deputy transports for medical care was 48% higher," according to the report. "Deputy transports, and additional hospitalizations, ER visits, external referrals and pharmaceutical expenses resulted in additional costs to the County beyond the contract fee."

106.    The audit further found that the contract with Corizon created cost overruns because it was not administered in accordance with the county's guidelines and best practices, it contained certain terms that did not adequately protect the county's interests, and the county didn't forecast and include sufficient funds in the jail's budget to cover all costs.

107.    Corizon was entitled to a four-year extension of its $8 million two-year contract, but the audit led county officials to cut the extension in half until competitive bids could be sought to improve medical care at the jail.

108.    One condition of Washington County's new contract with NaphCare is that the company is subject to accuracy checks from a third-party auditor who will examine hospital billings. The contract

also tightens budgetary controls and health service requirements, and includes specific staffing criteria for day and night shifts at the jail. Such contractual provisions are a good idea considering that NaphCare, a for-profit company, has the same business model as Corizon and thus the same financial incentives to skimp on staffing and medical care for prisoners.

109.    In the wake of seven prisoner deaths and subsequent lawsuits, prison healthcare provider Corizon has decided to not seek renewal of its contract at Kentucky's Metro Corrections in Louisville.

110.    For much of the last two decades, Corizon has been Metro Corrections' provider of prisoner healthcare. Its decision to walk away from its $5.5 million annual contract comes on the heels of the deaths of seven sick prisoners in the last year.

111.    Three lawsuits have been filed in recent months, contending Corizon staff ignored or dismissed prisoners' complaints and doctors were slow to review the prisoners' conditions or to send them to a hospital.

112.    A lawsuit filed in August on behalf of the family of Samantha George alleges that when she was taken to Metro Corrections on a charge of buying a stolen computer, she informed a nurse that she was

a severe diabetic, needed insulin, and was feverish and in pain from a MRSA infection. She was so ill she was unable to keep water down.

113.    The nurse contacted Corizon's on-call doctor to suggest George be sent to a hospital. To avoid that expense, the doctor said he would see George the next day. He never followed up on the matter.

114.    George's mother, Theresa, called Metro Corrections to advise them of the serious of her daughter's condition, which required insulin hourly. "They said 'I'm looking at her right now and she's fine,'" said Theresa George. "Four hours later, she was dead.

115.    Samantha George was found unresponsive in her cell on August 8, 2012, and was pronounced dead after being taken to a local hospital. It was concluded that she died of complications from a severe form of diabetes, compounded by heart disease.

116.    Weeks after George's death, prisoner Kenneth Cross died at Metro Corrections. He was arrested after a traffic stop that occurred while a friend was taking him to a hospital for an overdose. The arresting officers believed Cross was faking the overdose, so they took him to Metro Corrections on a warrant for a drug possession charge.

117.    The booking nurse noted Cross had "slurred speech" and fell asleep "several times during his interview." He was placed in a cell,

where he was found unconscious hours later. A short time later he was pronounced dead; a medical examiner noted the cause of death as a drug overdose.

118.    "Nodding off... clearly should raise a red flag in the case of someone who was arrested for drug possession," said Cross family attorney Gregory Belzley. "Either hospitalize him or put him under very careful observation in which he was not allowed to go to sleep."

119.    The Cross case is similar to the April 2012 death of Savannah Sparks, 27, She died from opiate abuse and withdrawal only six days after entering Metro Corrections.

120.    A December 2012 email from Metro Corrections Director Mark Belton advised his staff, "Mistakes were made by Corizon personnel and their corporation has acknowledged such mistakes." Six Corizon employees resigned amid an investigation into the deaths. With Corizon being out of its contract, a new contract will be selected amongst six proposed bidders.

## WHAT THE FORMER MEDICAL DIRECTOR OF CORIZON, CENTURION AND NAPHCARE HAS TESTIFIED TO

121.    The United States District Court in Arizona has found in Parsons v Ryan that:

122.    "Defendant Shinn is satisfied with a system that presents a substantial risk of serious harm. That is almost a perfect illustration of 'deliberate indifference." (p 111@ 24-26)

123.    Accordingly, it can be assumed that it was clear to Defendant Shinn at the time of the contract renewal that Centurion had significant concerns regarding its performance. (pp 111 @ 8-10)

124.    "The fundamental conclusion is that ADCRR prisoners who develop life threatening medical conditions are at significant risk of serious harm. The ones that do develop such conditions may die prematurely, suffer prolonged pain or die. The risk is applicable to all prisoners because anyone is susceptible to serious injury or illness at any time...no prisoner, at any location, is safe." (pp 122 @ 14-20)

125.    "Defendant Shinn's testimony also made clear he has adopted a strategy of pretending the problems he knows about do not exist." (pp 111@ 17-18)

126.    "Moreover specifically, Centurion apparently realized it would not be able to perform adequately and significant contempt fines were likely. To avoid catastrophic liability, Centurion ensured ADCRR would bear the brunt of nonperformance.. Shinn simply agreed to limit

Centurion's liability and insulated it from meaningful consequences for its failures" (pp 111 @ 10-16)

127.    "In essence, it is Defendants' position that access to any care, no matter how poor, satisfies their constitutional obligations." (pp 29 @ 2-3))

128.    "The question is whether the policies and procedures create a risk of harm to...prisoners. There is no question they do" (pp 117@21-23)

129.    "Are Defendants violating the constitutional rights of Arizona's prisoners...? The answer is yes..." (pp 1 @ 26 to 2 C3)

130.    Dr. Jordan testified medical schools do not teach the type of healthcare issues prisoners have, which are very bad. (pp 16 @ 21-28)

131.    "In Dr. Wilcox's expert opinion "the poor quality of clinical decision-making demonstrated by nurses and providers in the ADCRR harms patients and places them at an unreasonable and substantial risk of serious harm." (pp 28 @ 10-14

132.    "The current staffing levels illustrate ADCRR does not have the ability to address the varied and other complex needs of Arizona prisoners" (pp 22 @ 1-2)

133.    "Defendants have failed to provide, and continue to refuse to provide, a constitutionally adequate medical care....Defendants have

been aware of their failures for years and Defendants have refused to take necessary actions to remedy the failures. Defendants' years of inaction, despite Court intervention and imposition of monetary sanctions, establish Defendants are acting with deliberate indifference." (pp 2 @ 4-11)

134. Nursing Encounter Tools referrals by provider to Utilization Management and the responses, etc. (pp 13@ 12 -14 @ 18)

135. "Defendants have failed to provide, and continue to refuse to provide, a constitutionally adequate medical care....Defendants have been aware of their failures for years and Defendants have refused to take necessary actions to remedy the failures. Defendants' years of inaction, despite Court intervention and imposition of monetary sanctions, establish Defendants are acting with deliberate indifference." (pp 2 @ 4-11)

136. Nursing Encounter Tools referrals by provider to Utilization Management and the responses, etc. (pp 13@ 12 -14 @ 18

137. Dr. Wilcox was asked if he was "aware of any other health care settings where the nurse serves as the final decider when someone seeks to access their doctor." He responded "No." Considering that it's not really legal, you wouldn't expect to find any others. But, you know,

can you imagine in the community if you schedule an appointment with your doctor and you're met in the lobby by the nurse who does a little assessment on you and then turns you around and sends you home and you're not allowed to see your doctor? That just doesn't exist in the scope of healthcare anywhere" (pp 28 @ 15-20)

138.     "The majority of medical staff do not have the necessary training or licensure to provide the type of care that is necessary to provide constitutionally adequate care...The patterns of delay and indifference are pervasive." (pp 69@ line 22-26

## HOW THE SCHEME TO FRAUD DESIGNED BY CORIZON WORKED

139.     Billions of dollars have been allocated by the United States during the COVID. Corizon, an entity owned by Valitas ,Becken O'Keefe, obtained these funds. They however did not use these funds for the purposes intended.

140.     They gave their management bonuses, but the staff in the prisons got nothing.

141.     Corizon did this in every prison or jail, they have had contracts in.

142.    Wexford, Centurion and Naphcare did exactly what Corizon has done, but unlike Corizon, they have not filed for bankruptcy.

143.    Though Corizon has never maintained its principal place of business in Texas, it decided to restructure in Texas for the explicit purpose of defrauding the United States, creditors and prisoners.

144.    Corizon hired lawyers to help it perpetrate the fraud and obtained legal advice, unbeknown to these lawyers, for the success of its scheme. United States v Ballard, 779 F.2d 887(5th Cir. 1986) (communication not privileged when used to perpetrate crime.)

145.    The liability insurers provided Corizon with substantial assistance, because they did not follow their policies and industry practices, in dealing with claims, involving Corizon and other Defendants.

146.    Judge Stanley Sporkin in Lincoln Savings & Loan Assn. v. Wall, 743 F.Supp. 901 (DC 1990) wanted to know "where were these professionals ...when these improper transactions were being consummated? Why didn't they speak up?

147.    Attorneys, compliance officers, auditors, all did not follow their professional standards, and looked the other way, thereby aiding Corizon in its activities.

## THE CORPORATE VEIL MUST BE PIERCED AS THE MONIES THAT CORIZON AND OTHERS MISAPPROPRIATED IS RELEVANT TO THE BANKRUPTCY FILING , BY AND THROUGH THE ABUSE OF TEXAS LAW

148.    During the period January 2020 through January 2021 Corizon obtained funds authorized by 12 USC 4703a; 15 USC 636; 15 USC 9001; 15 USC 9009a; 15 USC 9011; 15 USC 9051; 21 USC 21516; 22 USC 4801; 42 USC 234; 42 USC 603; 50 USC 4532; amongst others, for the 25 contracts cancelled.

149.    In the applications to obtain these funds and subsequent reports on how these funds were used, they made materials misrepresentations, that the funds were not used, as represented, but were given as bonuses to executives, and misappropriated by senior staff. This bankruptcy does not account for these monies and Russell Perry does not explain what happened to these monies.

150.    Centurion, Wexford and Naphcare continued this practice, as they are, in effect, alter egos, of each other.

## THE BANKRUPTCY DOES NOT ADDRESS SPOLIATION OF EVIDENCE, AND THE USE OF BANKRUPTCY TO PUT A STOP TO TE FEDERAL COURTS RESOLVING SPOLIATION

151.    The relevant times are the times Defendants notified the courts of the Bankruptcy pending to stop the process s in the middle. Furthermore,  March 19, 2019 to date is the relevant time when Ullibarri took the evidence, as set forth in this complaint.. In May 2018 I received CDS/DVDS from counsel and this is the first time that I saw documents that reflect the concealment of evidence, a subject matter of this case.   In no uncertain terms the documents that I read in these CDS/DVDS from Weber Gallagher, Wexford, Corizon, Centurion, Gottfried, Carter, Morrissey, CENTURION LLC Klausner, Struck and others,   direct lawyers, not to disclose evidence to prisoners, and to use every procedural device to frustrate prisoner litigation. I requested and was denied names of the liability insurers. However in May 2021 I received the names of the insurers from the ADCRR.

## RESJUDICATA AND ESTOPPEL DOES NOT APPLY WHEN THROUGH UNLAWFUL ACTIVITY AND USE OF THE BANKRUPTCY PROCEEDINGS, THE PROCESS FOR JUDICIAL REVIEW HAS BEEN THWARTED

152.     As Defendants filed this Bankruptcy and prevented the appellate courts from ruling on the spoliation claims, the integrity of the process, mandated no res judicata or estoppel. It is they who stopped the process, in the middle.

153.     The evidence that I read were not presented to the judges in the cases that I filed for had they been presented, I would have prevailed in the litigation. No judge has ever ruled that Defendants did not conceal evidence. Concealment of evidence is not the same as failure to present evidence. One cannot present evidence that is concealed. As Defendants concealed the evidence, I  and other inmates could not present these. These evidence could not be presented prior to May 2018 as I did not have these. In March 2019 Ullibarri seized these evidence and through March 2020, I could not review whatever I had, by orders of Erwin, Boschuweicz and Ullibarri. Jonathan Kinser took my notes and paper copies of documents I had, from sealed boxes. This is why they were not presented.

154.     I also read in these CDS/DVDS motions for sanctions, responses, letters, about 70 settlement agreements nationwide, involving Wexford, Corizon, Centurion, CENTURION LLC in Pennsylvania, New Jersey, Illinois, Florida, New Mexico, Georgia and other states, and ADOC in Arizona, where concealment of evidence was alleged, and sanctions imposed.

155.     The claims are not barred as the concealed inculpatory evidence would have changed the results. Whenever factual and legal issues are not the same as to the case at hand, res judicata and collateral estoppel do not apply.     Extreme applications of the doctrine of res judicata may be inconsistent with a federal right that is "fundamental in character" The systemic concealment of evidence, and fabrication of defenses have not been previously litigated.

156.     Ullibarri has since 1998 been on contract with Ryan Shinn, though she is the most list qualified. Ullibarri has an associate degree in paralegal.    That is what has qualified her to be the person whom inmates contact for assistance.   She has the contract because there is an informal   understanding with Ullibarri, that she   must   convey privileged information to Carter, Gottfried, Morrissey, Ryan and Shinn, concerning   inmate   legal   materials/strategy.    To   give

Ryan/Shinn/Corizon/Centurion/Wexford an unfair advantage. those more qualified have been refused the contract, as they refuse to violate this privilege, and refuse to convey inmate confidential information to Defendants. She has had more than 4,000 complaints about violating attorney client privilege, impeding inmate access, conveying inmate privileged information to prison authorities, covered up by Carter, Gottfried, Morrissey, Johnson, Erwin, Dossett, Boschuweicz, Glynn, Klausner, Ryan and Shinn.

157.    In March 2019 upon the orders of Boschuweicz, Erwin, Glynn, Dudley, Ryan and others, Ullibarri took 35 CDS/DVDS with privileged documents, kept these for 79 days, and 14 of these are missing. She took this as agent of Weber Gallagher, Wexford, Corizon, Centurion, Gottfried, Carter, Morrissey, CENTURION LLC, Klausner, Struck and others.

158.    I had reviewed about 3 DVDS and took extensive notes from the about 9 gigabytes of documents that I had reviewed in these 3 CDS/DVDS. Jonathan Kinser took these notes, along with a folder with about 300 documents, from 19 sealed legal boxes. These boxes were sealed after they were inspected for contraband by Shelby

Negron, pursuant to prison policy, and pursuant to policy they were not to be opened, except by me, in my presence.

159. On April 20, 2020 Boschuweicz advised me that these 14 CDS/DVDS and documents were given to Erwin and Glynn, and their contents discussed with Gottfried, Carter and counsel for Corizon, Centurion and Wexford, by orders of Ryan. Shelby Negron advised me that documents on Wexford were mailed to Wexford in Pittsburgh by Negron as ordered by Boschuweicz.

## THE ROLE OF VALITAS IS VERY ACTIVE IN FINANCING HEALTHCARE ENTITIES THAT DEFRAUD THE COMMUNITY AS IS DONE BY CORRECTIONAL HEALTHCARE ENTERPRISE

160. Corizon, the nation's largest for-profit medical services provider for prisons, jails and other detention facilities, was formed in June 2011 through the merger of Prison Health Services (PHS) and Correctional Medical Services (CMS).

161. In April 2013, the debt-rating agency Moody's downgraded Corizon's nearly $360 million worth of debt to a rating of B2 – an indication the company's debt is highly speculative and a high credit risk. According to Moody's, the rating downgrade was due to an "expectation of earnings volatility following recent contract losses,

margin declines from competitive pricing pressure on new and renewed contracts, and Moody's belief that Valitás [Corizon's parent corporation] will be unable to restore metrics to levels commensurate with the prior B1 rating over the near to intermediate term."

162.    Valitás Health Services is majority owned by Beecken Petty O'Keefe & Company, a Chicago-based private equity management firm. Beecken's other holdings are primarily in the healthcare industry.

163.    On September 23, 2013, Moody's again downgraded Corizon's debt rating and changed the company's rating outlook from "stable" to "negative." The following month Corizon announced that it had replaced CEO Rich Hallworth with Woodrow A. Myers, Jr., the former chief medical officer at WellPoint Health. Hallworth, who had been appointed Corizon's CEO in 2011, previously served as the president and CEO of PHS. At the same time that Hallworth was replaced, Corizon president Stuart Campbell also stepped down.

164.    According to Corizon's website, the company provides healthcare services at over 530 correctional facilities serving approximately 378,000 prisoners in 28 states. In addition, Corizon employs around 14,000 staff members and contractors. The company's corporate

headquarters is located in Brentwood, Tennessee and its operational headquarters is in St. Louis, Missouri.

165.    The 2011 merger that created Corizon involved Valitás Health Services, the parent company of CMS, and America Service Group, the parent company of PHS. The Nashville Business Journal reported the deal was valued at $250 million.

166.    "Corizon's vision is firmly centered around service – to our clients, our patients and our employees," Campbell said at the time. "To that we add the insight of unparalleled experience assisting our client partners, and caring professionals serving the unique healthcare needs of [incarcerated] patients."

167.    Corizon has around $1.5 billion in annual revenue and contracts to provide medical services for the prison systems in 13 states. The company also contracts with numerous cities and counties to provide healthcare to prisoners held in local jails; some of Corizon's larger municipal clients include Atlanta, Philadelphia and New York City (including the Rikers Island jail). Additionally, the company has its own in-house pharmacy division, PharmaCorr, Inc.

168.    The prison healthcare market has flourished as state Departments of Corrections and local governments seek ways to save

money and reduce exposure to litigation. [See: PLN, May 2012, p.22]. Only a few major companies dominate the industry. Corizon's competitors include Wexford Health Sources, Armor Correctional Health Services, NaphCare, Correct Care Solutions and Centurion Managed Care – the latter being a joint venture of MHM Services and Centene Corporation. Around 20 states outsource all or some of the medical services in their prison systems.

169.     As Corizon is privately held, there is little transparency with respect to its internal operations and financial information, including costs of litigation when prisoners (or their surviving family members) sue the company, often alleging inadequate medical care.

170.     For example, when Corizon was questioned by the news media in Florida during a contract renewal, the company initially tried to prevent the release of its litigation history, claiming it was a "trade secret."

171.     In 2012, Corizon agreed to settle a lawsuit filed against PHS – one of its predecessor companies – by Prison Legal News, seeking records related to the resolution of legal claims against the firm in Vermont. Based on the records produced pursuant to that settlement,

PHS paid out almost $1.8 million in just six cases involving Vermont prisoners from 2007 to 2011. [See: PLN, Dec. 2012, p.16].

172.    Companies like Corizon provide healthcare in prisons and jails under the HMO model, with an emphasis on cutting costs – except that prisoners have no other options to obtain medical treatment except through the contractor.

173.    A former Corizon nurse had her license suspended and is currently under investigation by the Arizona State Board of Nursing for incompetence. In January 2014, nurse Patricia Talboy was accused of contaminating vials of insulin at three units at the ASPC-Lewis prison, potentially exposing two dozen prisoners to HIV or hepatitis.

174.    Talboy reportedly used a needle to stick prisoners' fingers to check their blood sugar levels. She then used the same needle to draw insulin from vials of the medication utilized for multiple prisoners, possibly contaminating the insulin in the vials. After placing the vials back into inventory, other staff members may have unknowingly used them to dispense insulin.

175.    "Every indication is that the incident is the result of the failure by one individual nurse to follow specific, standard and well-established nursing protocols when dispensing injected insulin to 24

inmates," Arizona Department of Corrections (ADC) director Charles L. Ryan said in a January 9, 2014 statement.

176.    Talboy's failure to follow procedures was discovered after a prisoner told a different nurse about the issue. Corizon reportedly delayed three days before publicly reporting the incident; in a press release, the company admitted that one of its nurses had been involved in "improper procedures for injections." Talboy received her nursing license in August 2012 and became an RN in June 2013; as a rookie nurse, Corizon likely paid her less than more experienced nurses.

177.    Following the insulin-related incident, the company was ordered to develop a comprehensive plan that includes "supplemental training and competency testing procedures for blood glucose testing and administration of insulin," as well as "nurse-peer reporting education to ensure professional accountability" and "patient awareness education on injection protocols."

178.    Granted, Corizon isn't alone with respect to such incidents. In August 2012, a nurse employed by the ADC's previous medical services contractor, Wexford Health Sources, contaminated the insulin supply at ASPC-Lewis through improper injection protocols,

potentially exposing 112 prisoners to hepatitis C. [See: PLN, July 2013, p.1].

179.     Corizon has a three-year, approximately $370 million contract to provide medical care in Arizona state prisons, which began in March 2013. The contract award generated controversy because former ADC director Terry Stewart was hired by Corizon as a consultant; current director Charles Ryan had previously worked under Stewart, raising a potential conflict of interest. Ryan denied any improprieties.

180.     According to a report by the American Friends Service Committee released in October 2013, titled "Death Yards: Continuing Problems with Arizona's Correctional Health Care," medical services in Arizona prisons did not improve after Corizon replaced Wexford as the ADC's healthcare contractor. "Correspondence from prisoners; analysis of medical records, autopsy reports, and investigations; and interviews with anonymous prison staff and outside experts indicate that, if anything, things have gotten worse," the report stated.

181.     In 2013, the Florida Department of Corrections (FDOC) awarded Corizon a five-year, $1.2 billion contract to provide medical services to state prisoners in north and central Florida. Wexford Health Sources was contracted to provide similar services in the southern region of

the state for $240 million. [See: PLN, June 2013, p.24]. The wholesale privatization of healthcare in Florida's prison system followed a 2011 legislative decision to disband the state's Correctional Medical Authority, which had oversight over prison medical care. [See: PLN, May 2012, p.30].

182.    The contracts were part of the Republican administration's initiative to expand privatization of government services, including prison management and healthcare, in spite of previous setbacks. In 2006, PHS withdrew two months into an almost $800 million contract to provide medical care to Florida prisoners; at that time, the company said the contract was not cost-effective and claimed it would lose money.

183.    The 2013 contract awards to Corizon and Wexford followed a two-year legal fight. In 2011, AFSCME Florida and the Federation of Physicians and Dentists/Alliance of Healthcare and Professional Employees filed suit challenging the prison healthcare contracts, in an effort to protect the jobs of nearly 2,600 state workers.

184.    On June 21, 2013 the First District Court of Appeals approved the privatization of medical care in FDOC facilities, overturning a ruling by the Leon County Circuit Court. The appellate court noted in

its decision that "The LBC [Legislative Budget Committee] simply moved funds from different line items within the Department's Health Services' program, providing additional funds for contracts that the Department otherwise had the authority to enter." See: Crews v. Florida Public Employers Council 79, 113 So.3d 1063 (Fla. Dist. Ct. App. 1st Dist. 2013).

185.    Under the terms of the FDOC's contract with Corizon, the company must provide medical care to Florida state prisoners for 7% less than it cost the FDOC in 2010. When entering into the contract, state officials apparently had few concerns about the numerous lawsuits previously filed against Corizon, and no hard feelings toward the company's predecessor, PHS, when it terminated its 2006 contract to provide medical services to Florida prisoners because it wasn't profitable.

186.    In a September 6, 2012 unpublished ruling, the Eleventh Circuit Court of Appeals affirmed a $1.2 million Florida jury verdict that found Corizon – when it was operating as PHS – had a policy or custom of refusing to send prisoners to hospitals. The Court of Appeals held it was reasonable for jurors to conclude that PHS had delayed

medical treatment in order to save money. See: Fields v. Corizon Health, 490 Fed.Appx. 174 (11th Cir. 2012).

187.    The jury verdict resulted from a suit filed against Corizon by former prisoner Brett A. Fields, Jr. In July 2007, Fields was being held in the Lee County, Florida jail on two misdemeanor convictions. After notifying PHS staff for several weeks that an infection was not improving, even with antibiotics that had been prescribed, Fields was diagnosed with MRSA. PHS did not send him to a hospital despite escalating symptoms, including uncontrolled twitching, partial paralysis and his intestines protruding from his rectum. A subsequent MRI scan revealed that Fields had a severe spinal compression; he was left partly paralyzed due to inadequate medical care.

188.    The Eleventh Circuit wrote that PHS "enforced its restrictive policy against sending prisoners to the hospital," and noted that a PHS nurse who treated Fields at the jail "testified that, at monthly nurses' meetings, medical supervisors 'yelled a lot about nurses sending inmates to hospitals.'" Further, PHS "instructed nurses to be sure that the inmate had an emergency because it cost money to send inmates to the hospital."

189.   At trial, the jury found that PHS had a custom or policy of deliberate indifference that violated Fields' constitutional right to be free from cruel and unusual punishment. The jurors concluded that Fields had a serious medical need, PHS was deliberately indifferent to that serious medical need, and the company's actions proximately caused Fields' injuries. The jury awarded him $700,000 in compensatory damages and $500,000 in punitive damages. [See: PLN, March 2013, p.54; Aug. 2011, p.24].

190.   More recently, the estate of a 21-year-old prisoner who died at a jail in Manatee County, Florida filed a lawsuit in October 2013 against the Manatee County Sheriff's Office and Corizon, the jail's healthcare provider. The complaint accuses the defendants of deliberate indifference to the serious medical needs of Jovon Frazier and violating his rights under the Eighth Amendment.

191.   In February 2009, Frazier was incarcerated at the Manatee County Jail; at the time of his medical intake screening, staff employed by Corizon, then operating as PHS, noted that his health was unremarkable. Frazier submitted a medical request form in July 2009, complaining of severe pain in his left shoulder and arm, and a PHS nurse gave him Tylenol.

192.     Throughout August and September 2009, Frazier submitted five more medical requests seeking treatment for his arm and shoulder. "It really hurts! HELP!" he wrote in one of the requests. PHS employees saw him and recorded his vital signs. Despite the repeated complaints, Frazier was never referred to a doctor or physician assistant; on September 9, 2009 his treatment was documented as routine but he was placed on the "MD's list."

193.     An X-ray was taken on September 17, 2009 to rule out a shoulder fracture. The X-ray was negative for a fracture, and Frazier was not referred to a doctor. He submitted two more medical requests that month and five requests in October 2009 seeking treatment for his increasingly painful condition. The complaint alleges that in total, Frazier submitted 13 medical request forms related to pain over a period of three months; he was seen by a nurse each time but not examined by a physician.

194.     On October 29, 2009, Frazier received an X-ray to determine if he had a tendon injury. An MRI was recommended and he was transported to a hospital where an MRI scan revealed a large soft tissue mass on his shoulder. A doctor at the hospital, concerned that the mass was cancerous, recommended additional tests.

195.    After being diagnosed with osteosarcoma, a form of bone cancer, Frazier was returned to the jail and subsequently treated at the Moffitt Cancer Center, where he received chemotherapy, medication and surgery. Despite this aggressive treatment the cancer progressed and Frazier's left arm was amputated. The cancer continued to spread, however, and he was diagnosed with lung cancer in June 2011. He died within three months of that diagnosis, on September 18, 2011.

196.    In a letter to the attorney representing Frazier's estate, Florida oncologist Howard R. Abel wrote that the lack of treatment provided by Corizon at the Manatee County Jail constituted "gross negligence and a reckless disregard to Mr. Frazier's right to timely and professionally appropriate medical care."

197.    The lawsuit filed by Frazier's estate claims that Corizon was aware of his serious medical condition but failed to provide adequate treatment. In addition, the complaint contends the company has a widespread custom, policy and practice of discouraging medical staff from referring prisoners to outside medical practitioners and from providing expensive medical tests and procedures. Finally, the lawsuit states that "Corizon implemented these widespread customs, policies and practices for financial reasons and in deliberate indifference to

[the] serious medical needs of Frazier and other inmates incarcerated at Manatee County Jail."

198.    On January 10, 2014, U.S. District Court Judge James Moody denied Corizon's motion to dismiss the case. The company had argued that the allegations in the lawsuit failed to assert sufficient facts to establish deliberate indifference, amounted only to medical negligence and were insufficient to establish gross negligence, and failed "to adequately allege a policy or custom that violated Frazier's rights." Judge Moody disagreed, finding the claims set forth in the complaint were "sufficient to establish a constitutional violation."

199.    The Manatee County Sheriff's Office had better luck with its motion to dismiss. The Sheriff argued the complaint did not establish facts indicating that the jail had a similar practice – like Corizon – of providing deliberately indifferent medical care to prisoners. The court agreed and dismissed the claims against the Sheriff's Office; the claims against Corizon remain pending. See: Jenkins v. Manatee County Sheriff, U.S.D.C. (M.D. Fla.), Case No. 8:13-cv-02796-JSM-TGW.

200.    In February 2013, the Idaho Department of Corrections (IDOC) announced it had reached a one-year extended agreement with

Corizon to provide medical care in the state's prison system. However, the Idaho Business Review reported that the extension also resulted in a rate increase. Then-Corizon president Stuart Campbell informed the IDOC Board of Correction that the company wouldn't sign an extension for less money, stating the current contract had become too costly. During the preceding three years of the contract the IDOC had incurred approximately 20% in cumulative rate increases.

201. Both sides agreed that the contract would run through December 2013 and the IDOC would pay an additional $250,000. It seems odd that Idaho was willing to continue contracting with the company, though, as the relationship between the IDOC and Corizon has been a rocky one.

202. The quality of medical care at the Idaho State Correctional Institution (ISCI) in Boise has been an ongoing issue for nearly three decades. The prison was the focus of a class-action lawsuit filed on behalf of prisoners alleging a variety of problems, including inadequate healthcare. The lawsuit was known as the Balla litigation after plaintiff Walter Balla.

203. In July 2011, after new complaints were filed regarding medical care at ISCI, U.S District Court Judge B. Lynn Winmill appointed a

special master, Dr. Marc F. Stern, to assess the situation at the facility. The court wanted Stern to confirm whether ISCI was in compliance with the temporary agreements established in the Balla case, and to investigate and report on "the constitutionality of healthcare" at the facility.

204.    Dr. Stern, a former health services director for the Washington Department of Corrections who also had previously worked for CMS, one of Corizon's predecessor companies, issued a scathing report in February 2012. With the aid of psychiatrist Dr. Amanda Ruiz, Stern and his team reviewed ISCI over a six-day period and met with dozens of prisoners, administrators and Corizon employees.

205.    Stern stated in the report's executive summary: "I found serious problems with the delivery of medical and mental health care. Many of these problems have either resulted or risk resulting in serious harm to prisoners at ISCI. In multiple ways, these conditions violate the rights of prisoners at ISCI to be protected from cruel and unusual punishment. Since many of these problems are frequent, pervasive, long-standing, and authorities are or should have been aware of them, it is my opinion that authorities are deliberately indifferent to the serious health care needs of their charges."

206.     The report found that prisoners who were terminally ill or in long-term care were sometimes left in soiled linens, given inadequate pain medication and went for long periods without food or water. The findings regarding sick call noted instances in which prisoners' requests either resulted in no care, delayed care or treatment that was deemed dangerous. Emergency care situations had insufficient oversight, delays or no response; inadequately trained medical staff operated independently during emergencies without oversight from an RN or physician. The report also found problems with the pharmacy and medication distribution at ISCI.

207.     In one case, a prisoner with a "history of heart disease was inexplicably dropped from the rolls of the heart disease Chronic Care Clinic." As a result, medical staff stopped conducting regular check-ups and assessments related to the prisoner's heart condition. A few years later the prisoner went in for a routine visit, complaining of occasional chest pain. No evaluation or treatment was ordered and the prisoner died four days later due to a heart attack. In another case, Corizon staff failed to notify a prisoner for seven months that an X-ray indicated he might have cancer.

208.     Dr. Stern's report not only reviewed processes but also staff competency and adequacy. The report cited allegations that a dialysis nurse at ISCI overtly did not like prisoners, and routinely "failed to provide food and water to patients during dialysis, prematurely aborted dialysis sessions or simply did not provide them [dialysis] at all and failed to provide ordered medications resulting in patients becoming anemic." Stern concluded that prison officials were aware of this issue and the danger it presented to prisoners, but "unduly delayed taking action."

209.     The mental health care provided by Corizon at ISCI was found to be deficient by Dr. Ruiz, who conducted the psychiatric portion of the court-ordered review. The report noted that the facility had 1) inadequate "screening of and evaluating prisoners to identify those in need of mental health care," 2) "significant deficiencies in the treatment program at ISCI" which was "violative of patients' constitutional right to health care," 3) an "insufficient number of psychiatric practitioners at ISCI," 4) incomplete or inaccurate treatment records, 5) problems with psychotropic medications, which were prescribed with no face-to-face visits or follow-up visits with prisoners and 6) inadequate suicide prevention training.

210.     The report concluded: "The state of guiding documents, the inmate grievance system, death reviews and a mental health CQI [continuous quality improvement] system at ISCI is poor. While not in and of themselves unconstitutional, it is important for the court to be aware of this and its possible contribution to other unconstitutional events."

211.     In March 2012, shortly after Dr. Stern's report was released over the objection of state officials, Corizon disagreed with its findings. The company retained the National Commission on Correctional Health Care (NCCHC) to review the report. Corizon described the review as an "independent assessment," even though it was paying NCCHC accreditation fees.

212.     The NCCHC review consisted of a three-person team assessing the facility over a two-day period in April 2012. Unlike Stern's assessment of medical and mental health care, the NCCHC team did not interview prisoners or include a psychiatrist. Regardless, the agency concluded that "The basic structure of health services delivery at ISCI meets NCCHC's standards."

213.     Corizon stated in a press release that Dr. Stern's report was "incomplete, misleading and erroneous," and then-CEO Rich

CORRECTED VERIFIED ADVERSARY COMPLAINT  TRIPATI v TEHUM CARE
SERVICES INC   No: 23-90086 (CML) Page **64** of **182**

Hallworth appeared in a video defending the company. The NCCHC had previously accredited Corizon's healthcare services at ISCI, thus in essence the NCCHC's review was self-validating the organization's prior accreditation findings. Also, according to NCCHC's website, two Corizon officials sit on the agency's health professionals certification board of trustees.

214.     Corizon's criticism of Dr. Stern's report is just one example where the company has objected to an independent, third-party assessment of its medical services. The Balla case settled in May 2012 after 30 years of litigation. [See: PLN, Feb. 2013, p.40].

215.     Following a competitive bidding process, Corizon was selected to continue providing medical care to Indiana state prisoners under a three-year contract effective January 1, 2014. The contract has a cap of $293 million, based on a per diem fee of $9.41 per prisoner.

216.     Three weeks later, a lawsuit filed in federal court named Corizon and the Indiana Department of Correction as defendants in connection with the wrongful death of prisoner Rachel Wood. Wood, 26, a first-time drug offender, died in April 2012; the suit, filed on behalf of her family, claims she was transferred from prison to prison and denied care for her serious medical conditions, which included lupus and a

blood clotting disorder.

"Notwithstanding the duty of the prison medical staff to provide adequate medical care to Rachel and to treat her very serious life threatening conditions, prison medical staff willfully and callously disregarded her condition, and allowed Rachel to deteriorate and die," the complaint stated.

217.    "That is just the attitude of these guys, is saving money rather than providing health care," said Michael K. Sutherlin, the attorney representing Wood's family.

218.    Prison officials reportedly moved Wood among several different prisons and hospitals, and at one point lost track of her and claimed she had escaped even though she was still incarcerated.

219.    "She died a horrible death and she died alone," stated her father, Claude Wood. The lawsuit remains pending. See: Williams v. Indiana DOC, Marion County Superior Court (IN), Case No. 49D05-1401-CT-001478.

220.    In an October 2013 Bangor Daily News article, Steve Lewicki, coordinator of the Maine Prisoner Advocacy Coalition, discussed the state of healthcare in Maine's prison system. "Complaints by prisoners are less," he said, noting that while medical services provided to

prisoners are better than in the past, there are still concerns. This relative improvement coincided with the end of the state's contract with Corizon. The contract, valued at approximately $19.5 million, was awarded to another company in 2012.

221.    A year earlier, the Maine legislature's Office of Program Evaluation and Government Accountability (OPEGA) completed a review of medical services in state prisons. The agency contracted with an independent consultant, MGT of America, to conduct most of the fieldwork, and the review included services provided under Corizon's predecessor company, CMS.

222.    The OPEGA report, issued in November 2011, cited various deficiencies in medical care at Maine prisons – including medications not always being properly administered and recorded by CMS staff. Although the company was notified of the problem, no corrective action was taken. CMS employees did not follow policies related to medical intake and medical records; OPEGA reported that 38% of prisoners' medical files had inadequate or inaccurate documentation regarding annual physical assessments, and that files were not complete or consistently maintained. The report found 11% of sick

calls reviewed were either not resolved timely or had no documented resolution. OPEGA also criticized CMS for inadequate staff training.

223.    At a January 2012 legislative committee hearing, state Senator Roger Katz asked Corizon regional vice president Larry Amberger, "My question to you is in light of this history, why should the state seriously be considering any proposal your company might make to get this contract back again?"

224.    In response, Amberger criticized the methodology used by MGT during the assessment and said he believed Corizon provided quality medical care. Questioning and challenging the findings of an independent reviewer is the same tactic the company used in Idaho. Regardless, Corizon's contract to provide medical care to Maine state prisoners is now a part of history.

225.    While some jurisdictions, like Maine, have chosen not to renew their contracts with Corizon due to performance-related problems, in 2013 the Metro Department of Corrections in Louisville, Kentucky (LMC) offered the company a chance to rebid for its $5.5 million contract to provide medical care at the LMC jail. This time, however, it was Corizon that said "no thanks."

226.     The rebid offer was made even though seven healthcare-related prisoner deaths occurred in a seven-month period in 2012 during Corizon's prior contract, which expired in February 2013. Nevertheless, LMC and Corizon agreed to extend the contract through July 30, 2013 on a month-to-month basis pending a formal rebid.

227.     After the expiration of the month-to-month contract extension, Corizon notified LMC that it was no longer interested in providing services to the corrections department and would not seek to rebid the contract. LMC director Mark Bolton told the Courier Journal he was "surprised" by the company's decision. What seems more surprising is that LMC wanted to continue contracting with Corizon to provide medical services in spite of the number of prisoner deaths.

228.     In April 2012, Savannah Sparks, 27, a heroin addict and mother of three, was arrested and held on shoplifting charges at the LMC jail. While withdrawing from heroin she vomited, sweat profusely, could not sit up, could not eat or drink, and defecated and urinated on herself. Six days later she was dead. According to the medical examiner, her death was due to "complications of chronic substance abuse with withdrawal."

229.     A subsequent wrongful death suit alleged that Corizon and LMC employees were negligent in failing to provide treatment for Sparks' opiate addiction and withdrawal. Corizon settled the suit under confidential terms. See: May v. Corizon, Jefferson County Circuit Court (KY), Case No. 13-CI-001848.

230.     Four months after Sparks' death, on August 8, 2012, another LMC prisoner, Samantha George, died. A lawsuit filed in Jefferson County Circuit Court claimed that George was moved from the Bullitt County Jail to the LMC facility on a charge of buying a stolen computer. According to the complaint, she told a Corizon nurse that she was a severe diabetic, needed insulin, and was feverish and in pain from a MRSA infection.

231.     The nurse notified an on-call Corizon physician, who was not located at the facility and thus could not examine George in person, to decide if she should be taken to an emergency room. The doctor recommended monitoring George and indicated he would see her the next day. George's condition rapidly deteriorated while she was monitored by staff at the jail; she was found unresponsive a few hours after being admitted to the facility and pronounced dead a short time later.

232.    An autopsy concluded that George died due to complications from a severe form of diabetes compounded by heart disease. According to the lawsuit, the Corizon doctor never saw George; among other defendants, the suit named Corizon and LMC director Mark Bolton as defendants. The case was removed to federal court, then remanded to the county circuit court in October 2013. See: George v. Corizon, U.S.D.C. (W.D. Ky.), Case No. 3:13-cv-00822-JHM-JDM.

233.    A few weeks after George's death, Kenneth Cross was booked into the LMC jail on a warrant for drug possession. According to a subsequent lawsuit, upon Cross' arrival at the jail a nurse documented that he had slurred speech and fell asleep numerous times during the medical interview. Several hours later he was found unconscious, then died shortly thereafter due to a drug overdose. The lawsuit filed by Cross' estate alleged that employees at the LMC jail were deficient in recognizing and treating prisoners' substance abuse problems and that the facility was inadequately staffed for such medical care.

234.    After the deaths of Sparks, George, Cross and four other prisoners in 2012, LMC director Bolton said he believed Corizon took too long to evaluate and treat prisoners at the jail. According to the Courier-Journal, Bolton sent an email to his staff in December 2012

regarding the prisoners' deaths, stating, "Mistakes were made by Corizon personnel and their corporation has acknowledged such missteps." He further indicated that Corizon employees – not LMC staff members – were responsible for the care of the prisoners who died. Six Corizon employees at the LMC jail resigned in December 2012 during an internal investigation; they were not identified.

235. Bolton's criticism was too little, too late to prevent the deaths of the seven LMC prisoners, though the jail has since made improvements to its medical services, including a full-time detox nurse and new protocols for prisoners experiencing withdrawal. One could speculate that LMC's critique of Corizon might be a litigation tactic, to deflect responsibility. The fact remains that seven deaths occurred under Corizon's watch and, notwithstanding those deaths, LMC was willing to renew its contract with the company.

236. In January 2014, the Louisville Metro Police's Public Integrity Unit concluded investigations into three of the deaths at the jail, and criticized both Corizon and LMC. The Commonwealth Attorney's Office found that Sparks' and George's deaths were preventable; however, no criminal charges were filed. Dr. William Smock, a forensic examiner who served as a consultant during the investigations, stated

with respect to George's death: "There is compelling evidence of a significant deviation from the standard of care and medical negligence on the part of the medical providers."

"I'm glad to see that the government's investigation matches exactly what our investigation showed, which is that her death and others like hers is easily preventable," said Chad McCoy, the attorney representing George's estate.

237.   After providing medical care to Minnesota state prisoners for 15 years, Corizon was not selected when the contract was rebid in 2013 – despite having submitted the lowest bid. Instead, competitor Centurion Managed Care was to begin providing healthcare services in Minnesota's prison system effective January 1, 2014 under a two-year, $67.5 million contract.

238.   Corrections Commissioner Tom Roy said the contract with Centurion was expected to "deliver significant savings to taxpayers while improving the quality of care for offenders."

According to the Star-Tribune, nine prisoners died and another 21 suffered serious or critical injuries in Minnesota correctional facilities due to delay or denial of medical care under the state's previous

contract, which had been held by Corizon or its predecessor, CMS, since 1998.

239.    That contract was for a fixed annual flat fee of $28 million. A flat fee contract provides an incentive for the contractor to tightly control costs, as a reduction in expenses results in an increase in profit. The Star-Tribune found that many of the staffing arrangements negotiated in the contract played a role in the deaths and injuries. For example, the contract allowed Corizon physicians to leave at 4:00pm daily and did not require them to work weekends. During off-hours there was only one doctor on call to serve the state's entire prison system, and many of the off-hour consultations were done telephonically without the benefit of the prisoner's medical chart. Under the contract, Corizon was not required to staff most facilities overnight.

240.    The Minnesota Department of Corrections was held liable for nearly $1.8 million in wrongful death and medical negligence cases during the period when the state contracted with Corizon or CMS.

241.    In October 2012, a jury in Washington County awarded Minnesota prisoner Stanley Riley more than $1 million after finding a Corizon contract physician, Stephen J. Craane, was negligent in providing medical treatment. The Star-Tribune reported that Riley

suffered from what turned out to be cancer and had written a series of pleading notes to prison officials. One read, "I assure you that I am not a malingerer. I only want to be healthy again."

242.  In May 2013, the state paid $400,000 to settle a lawsuit over the death of a 27-year-old prisoner at MCF-Rush City. Xavius Scullark-Johnson, a schizophrenic, suffered at least seven seizures in his cell on June 28, 2010. Nurses and guards didn't provide him with medical care for nearly eight hours. According to documents obtained by the Star-Tribune, Scullark-Johnson was found "soaked in urine on the floor of his cell" and was "coiled in a fetal position and in an altered state of consciousness that suggested he had suffered a seizure." An ambulance was called several hours later but a nurse at the prison turned it away, apparently due to protocols to cut costs. Corizon settled the lawsuit for an undisclosed sum in June 2013. See: Scullark v. Garin, U.S.D.C. (D. Minn.), Case No. 0:12-cv-01505-RHK-FLN.

243.  In Philadelphia, Mayor Michael A. Nutter has been accused of being too loyal to his campaign contributors, including Corizon. The company donated $1,000 to Nutter's 2012 campaign committee several months before the city renewed Corizon's contract to provide medical

care to 9,000 prisoners in Philadelphia's prison system. Further, PHS donated $5,000 to Nutter's mayoral campaign in 2008.

244.    The contract renewal would have been routine except for the fact that Corizon's performance in Philadelphia has been far from stellar. In July 2012 the company agreed to pay the city $1.85 million following an investigation that found Corizon was using a minority-owned subcontractor that did no work, which was a sham to meet the city's requirements for contracting with minority-owned businesses.

245.    The renewed year-to-year Corizon contract, worth $42 million, began in March 2013. Nutter's administration was accused of using the year-to-year arrangement to avoid having the contract scrutinized by the city council; the city's Home Rule Charter requires all contracts of more than one year to be reviewed by the council. Further infuriating opponents of the contract, Corizon was not the lowest bidder. Correctional Medical Care (CMC), a competitor, submitted a bid that would have cost the city $3.5 million less per year than Corizon. Philadelphia Prison Commissioner Louis Giorla defended the city's decision to award the contract to Corizon at a council hearing; however, he declined to answer questions as to why the

administration considered Corizon's level of care to be superior to that provided by CMC.

246.      Three union contracts with Corizon covering 270 of the company's workers in Philadelphia's prison system expired on November 26, 2013. Corizon demanded benefit cuts, including changes in employee healthcare programs, to offset wage increases promised under the company's contract with the city. A strike was averted in December 2013 when the mayor's office intervened and both sides reached a settlement. The Philadelphia Daily News reported that the new union contracts provide wage increases but also include a less-generous health insurance plan for Corizon employees.

247.      Since 1995, Corizon and its predecessor, PHS, have received $196 million in city contracts. The company's contract was terminated for several months in 2002 as a result of complaints that a diabetic prisoner had died after failing to receive insulin. The city renewed the contract anyway, citing affordability and pledging increased oversight. The city's law department estimates that Philadelphia has paid over $1 million to settle lawsuits involving claims of deficient prison healthcare; the largest settlement to date is $300,000, paid to a prisoner who did not receive eye surgery and is now partially blind.

248.    Based upon the number of lawsuits filed against Corizon alleging inadequate medical care, its use of a sham subcontractor and the company's treatment of its own employees, it appears that maintaining the status quo – not best practices – may be the controlling factor in Philadelphia's continued relationship with Corizon.

249.    On September 30, 2013, a prisoner jumped from the top tier of a pod at the Allegheny County Jail. Following an investigation, authorities refused to make public their findings and declined to disclose the prisoner's injuries, citing medical privacy laws. The prisoner, Milan Karan, 38, was not transported to the hospital until the following day.

250.    A spokesperson for Corizon, which provides medical care at the 2,500-bed jail, defended the nearly 24-hour delay by noting the prisoner "was under observation" before being sent to a hospital.

251.    In December 2013, the Pittsburgh Post-Gazette reported that Corizon was having difficulty staffing the Allegheny County Jail. When the newspaper requested a comment from Corizon vice president Lee Harrington, Harrington claimed he had no knowledge of staffing problems – despite having previously received emails from the

facility's warden about that exact issue.

The staffing problems resulted in prisoners not receiving their medication in a timely manner. In emails obtained by the Post-Gazette, Warden Orlando Harper wrote to Harrington in October 2013, noting, "We are continuing to experience issues pertaining to the following: 1. Staffing, 2. Medication distribution." Also, on November 17, 2013, Deputy Warden Monica Long sent an email to Corizon and jail staff. "I was just informed by the Captain on shift, the majority of the jail has not received medication AT ALL," she stated, adding, "Staffing is at a crisis."

252.    That crisis had been ongoing since Corizon assumed the medical services contract at the facility on September 1, 2013. Before the $62.55 million, five-year contract was awarded, Corizon vice president Mary Silva wrote in an email that it was imperative the jail have "adequate staffing on ALL shifts." That promise was made despite Corizon laying off many of the former employees of Allegheny Correctional Health Services, the jail's previous healthcare provider.

253.    Allegheny Correctional had provided four full-time and one part-time physician during its contract tenure. Corizon reduced the number of doctors to one full-time and one part-time physician. Allegheny

Correctional also employed three psychiatrists and one psychologist. Corizon's contract requires that it provide one full-time psychiatrist and a part-time psychologist.

254.    In January 2014, the United Steelworkers union (USW) filed a petition with the National Labor Relations Board to unionize Corizon employees at the Allegheny County Jail, including nurse practitioners, RNs, physician assistants and psychiatric nurses. USW representative Randa Ruge indicated that the Corizon workers had approached the union for representation due to intolerable working conditions.

255.    "Our folks [Corizon employees] are in danger of losing their licenses to practice by some of the things that the company has them doing," she said. Ruge told the Post-Gazette that the jail had run out of insulin for more than a week and Corizon supervisors had "countermanded doctors' orders."

256.    Several weeks after the USW filed the labor petition, a Catholic nun who worked as an RN at the jail was fired by Corizon, allegedly for union organizing activities. Sister Barbara Finch was dismissed after she openly expressed concerns about staffing, patient care and safety at the facility. The USW filed an unfair labor complaint against

Corizon regarding Finch's dismissal, claiming she was terminated in retaliation for her union activities.

257.     "This is a clear case of intimidation and union-busting at its worst," said USW President Leo W. Gerard. "Sister Barbara has been an outspoken advocate of change for these courageous workers and their patients, and this kind of illegal and unjust action, unfortunately, is par for the course with Corizon."

On February 14, 2014, Corizon employees at the Allegheny County Jail voted overwhelmingly to unionize. "The next step is getting to the bargaining table and getting Corizon to bargain in good faith and get some changes made in the health system at the jail," said Ruge.

258.     The previous week, Allegheny County Controller Chelsa Wagner stated she had "grave and serious concerns" about medical care at the facility, including issues related to staffing and treatment for prisoners with certain mental health conditions. "I regard the current situation as intolerable and outrageous, and I fully expect necessary changes to be urgently implemented," she wrote in a letter to Corizon.

259.     On August 29, 2013, Ieasha Lenise Meyers, incarcerated at the jail in Polk County, Iowa on a probation violation, gave birth on a mattress on the floor of her cell. Her cellmates assisted with the

delivery. Earlier, when Meyers, 25, had complained of contractions, a Corizon nurse called an offsite medical supervisor and was told to monitor the contractions and check for water breaking.

260.    Despite Meyers having been twice sent to a hospital earlier the same day, and pleading that she was about to give birth, the nurse did rounds in other parts of the jail. Guards reportedly did not check on Meyers as required, even though the birth could be seen on a nearby security monitor. Only after the baby was born was medical care provided. Sheriff Bill McCarthy defended the actions of jail staff.

261.    Like most private contractors that provide prison-related services, Corizon tends to cut costs in terms of staffing and operational expenses. As noted above, this includes paying lower wages, providing fewer or inferior benefits and hiring less qualified workers who can be paid less. Sometimes, however, these practices result in employees more like to engage in misconduct.

262.    At the Pendleton Correctional Facility in Indiana, a Corizon nurse was arrested and charged with sexual misconduct, a Class C felony. The Herald Bulletin reported that in April 2013, when Colette Ficklin was working as a contract nurse for Corizon, she convinced a prisoner to fake chest pains so they could be alone in an exam room. A

guard told internal affairs officers that she witnessed Ficklin and the prisoner engaging in sex acts in the prison's infirmary. [See: PLN, Sept. 2013, p.17].

263.     In March 2013 at the Indiana State Prison in Michigan City, a Corizon practical nurse was charged with drug trafficking and possession with intent to distribute. Phyllis Ungerank, 41, was arrested and booked into the LaPort County Jail after attempting to smuggle marijuana into the facility. [See: PLN, July 2012, p.50].

264.     A Corizon nurse at the Volusia County Branch Jail in Daytona Beach, Florida was fired after officials learned she was having sex with and giving money to a prisoner. Valerie Konieczny was terminated on December 18, 2012 when the jail was contacted by the brother of prisoner Randy Joe Schimp, who had written in a letter that a nurse was having sex with him and depositing money into his jail account. Investigators determined that Konieczny was the nurse who had sex with Schimp at both the Volusia County facility and another branch jail in 2011.

265.     In New Mexico, Corizon physician Mark Walden was accused of fondling prisoners' genitals and performing prostrate exams that were "excessive and inappropriate in terms of length and method." At times,

Walden reportedly did not wear gloves during the prostate exams. He was accused of sexually abusing 25 or more male prisoners while employed as a doctor at two privately-operated facilities, the Guadalupe County Correctional Facility in Santa Rosa and Northeast New Mexico Detention Facility in Clayton.

266.    Lawsuits were filed against Walden, Corizon and private prison operator GEO Group, and Walden's medical license was suspended in December 2013. The suits claim that Corizon allowed Dr. Walden to work at the Clayton prison "despite knowing of the risk of sexual abuse and having the ability to know that [he] was repeatedly sexually abusing patients" at the Santa Rosa facility. [see: pln, sept. 2013, p.47].

267.    The role of Beecken Petty O'keefe & Company in Corizon's scheme according to BPOC

268.    As one of the longest-tenured, pure play healthcare private equity firms in the United States, BPOC has structured, managed and realized investments on behalf of institutional and individual investors for nearly two decades.

269.    Founded in 1996, BPOC ranks among the country's oldest private equity management firms in the United States that specialize

exclusively in healthcare. The firm and its investment professionals provide a powerful combination of financial and operational experience and expertise.

270. Our industry knowledge combined with a long-term historical perspective has resulted in successful investments across regulatory, economic and financial market cycles. BPOC's goal is to deliver superior performance, form enduring partnerships and provide unparalleled investment leadership.

271. We seek to partner with healthcare companies poised for strong, transformational growth. We assume an active role as collaborative partners from the very onset of our investment and have been praised for our sense of fair dealing and teamwork.

272. We look for companies whose management teams are creative and inventive and that require capital for growth and significant value creation. We support management with our deep experience, but when additional expertise is needed, we may also augment our skills with our healthcare relationships forged over decades of involvement in the industry.

273.    Whether you're an investor, a company or an executive, we'd like to hear from you. To send us a message, please contact us at partners@bpoc.com.

274.    We seek to partner with healthcare companies poised for strong, transformational growth. We assume an active role as collaborative partners from the very onset of our investment and have been praised for our sense of fair dealing and teamwork.

275.    We look for companies whose management teams are creative and inventive and that require capital for growth and significant value creation. We support management with our deep experience, but when additional expertise is needed, we may also augment our skills with our healthcare relationships forged over decades of involvement in the industry.

276.    Whether you're an investor, a company or an executive, we'd like to hear from you. To send us a message, please contact us at partners@bpoc.com.

277.    We seek to partner with healthcare companies poised for strong, transformational growth. We assume an active role as collaborative partners from the very onset of our investment and have been praised for our sense of fair dealing and teamwork.

278.    We look for companies whose management teams are creative and inventive and that require capital for growth and significant value creation. We support management with our deep experience, but when additional expertise is needed, we may also augment our skills with our healthcare relationships forged over decades of involvement in the industry.

279.    Whether you're an investor, a company or an executive, we'd like to hear from you. To send us a message, please contact us at partners@bpoc.com.

280.    Medium-sized companies in the healthcare services segment. These companies are run by highly capable management teams and exhibit identifiable competitive advantages, significant barriers-to-entry, and the potential for a high return on invested capital. Investments are prudently leveraged acquisitions of corporate subsidiaries; recapitalizations of founder-owned and operated entities; and management-led acquisitions of independent companies. Total enterprise values typically range from $50 million to $500 million.

281.    Mid-Market Buyouts. A large portion of our investments are buyouts in smaller companies—typically with EBITDA in excess of $5 million—operating in the healthcare service, medical product and

information technology segments. Target companies will be in high-growth segments that exhibit high user-adoption rates and compelling demographic trends; provide an unmet clinical or service need; and reduce costs in the healthcare delivery system. Typically, EBITDA values range from $5 million to $50 million.

282.    Medical Solutions, one of the nation's largest travel nurse staffing companies, has again earned a position on Inc.magazine's Inc. 5000 list. The Omaha-based healthcare staffing company ranked in position #1463 on the 2016 Inc. 5000 list, with 262% growth over a three-year period and a 2015 revenue of $217 million.

283.    This marks the ninth time in the previous 10 years that Medical Solutions earned a spot on the Inc. 5000, including one year on the Inc. 500, illustrating a continued pattern of strong growth for the pet-friendly healthcare staffing company. Headquartered in Omaha, Nebraska, the nationwide travel nurse staffing company also ranked #7 amongst top Nebraska companies on the 2016 Inc. 5000 list.

284.    "Our amazing team is the reason we consistently see such impressive growth, and I am so proud of them for once again earning us a spot on the prestigious Inc. 5000 list," said Medical Solutions CEO Craig Meier. "Medical Solutions' strong commitment to offering a

superior experience to nurses, hospitals, and our internal team remains solid as we grow. That firm commitment to customer and employee happiness is the number one thing that promotes our continued success."

## A LOOK AT SOME SPECIFIC FRAUDULENT STATEMENTS CORIZON MAKES TO COERCE CONTRACTS

285.    Corizon Health issued a letter to D.C. City Council Chairman Phil Mendelson in response to several questions he raised regarding Corizon Health's testimony during the March 12 Office of Contracting and Procurement oversight hearing.

Re: Corizon Health Testimony

Dear Chairman Mendelson:

Thank you again for giving me and my Corizon Health colleagues the opportunity to appear before your March 12 Office of Contracting and Procurement oversight hearing. This letter is intended to respond to several questions you raised and, in doing so, provide additional material for the hearing record.

Litigation: As part of my response to your question about litigation, I testified that the ratio of lawsuits to our average daily patient

population is substantially lower than Unity Health's. Please let me offer some additional background:

Mr. Chairman, it is important to note that Unity has applied for and enjoys the status of a "deemed Federal health center" (please see the attached HRSA public record). As a result, Unity is in many cases protected from malpractice and other professional liability lawsuits filed under the Federal Tort Claims Act. Corizon Health has no such protection. Accordingly, any comparison of lawsuits filed is "apples to oranges" and likely in Unity's favor. Furthermore, inmates and returning citizens who are legitimately harmed and seek legal redress, may well not have the same recourse under the incumbent contract as they would under the awarded agreement. With that stated, the following ratios illustrate our case for Corizon Health having fewer lawsuits per inmate served than Unity:

Unity states it has been subject to eleven lawsuits in caring for an average of 2,500 inmates annually over the past five years. That equates to one lawsuit for every 1,136 inmates served.

Corizon Health, on the other hand, has served on average 400,000 inmates annually over the past five years and has had 1,364 lawsuits. That equates to one lawsuit for every 1,466 inmates served.

Having provided correctional healthcare services for more than 30 years, our company has gained unique knowledge and experience allowing for the administration of the most effective risk-management available. During the period of June 1, 2009 to May 31, 2014, our company provided literally millions of patient care encounters − yet during this same period, we have only been subjected to 1,364 lawsuits. Of these 1,364 lawsuits, 942 (69%) are now closed while 422 (31%) remain open. Of the closed lawsuits, fully 821 (87%) were dismissed by the courts, administratively closed or resulted in a judgment in favor of Corizon Health. Furthermore, it serves as compelling evidence of our strong, effective professional liability risk-management program that Corizon Health has elected to settle only approximately 117 (12%) of the closed lawsuits after careful evaluation of the costs associated with continued litigation. Consistent with the highly litigious nature of the correctional healthcare industry, it is important to note that 1,049 (77%) of the healthcare-related lawsuits filed against Corizon Health over the past five years were initiated by pro se inmates. Further, of the 315 represented healthcare-related lawsuits filed against Corizon Health, only 123 (39%) remain open at this time.

As you may be aware, a very detailed five-year combined litigation history for Corizon Health, Inc. and its related company Corizon, LLC. (collectively "Corizon") was provided on a proprietary basis as part of our RFP response, and for consideration in the ultimate award decision.

Partnerships with Certified Business Enterprises, Community Clinics and Other Service Providers: You asked my colleague, Michael Miller, about our relationships with D.C. community clinics able to provide outside clinical, counseling and other pertinent re-entry services.

Partnership has been the foundation of the successful relationships Corizon Health builds with our clients. In our RFP submission, we committed to have our healthcare team work closely and collaboratively with the community providers of the Community-Oriented Correctional Healthcare System (COCHS), including with University Legal Services (ULS), the United States Parole Commission (USPC) and Addiction Prevention and Recovery Administration (APRA), to maintain effectual relationships befitting the inmate population. Corizon will cooperate with ULS in assisting inmates in connecting with Department of Behavioral Health's Core Service Agencies and other providers in the community as part of our discharge planning process.

Corizon Health has contracted with multiple CBE healthcare providers to grant them more than 40 percent of the dollar amount of the primary contract, exceeding the requirement set forth in the RFP. More specifically, we have committed to deliver more than $30 million in CBE revenue to D.C.-based MBI Health Services, LLC, our partner who will provide critical nurse staffing and behavioral health services. MBI has a proven track record of providing quality healthcare services, as well as mentoring, training, job placement, recovery group activity and outreach services to returning citizens. Another local CBE, Business 2IT Solutions, will provide us with technology support.

We have also partnered with George Washington University Medical Faculty Associates to implement cost-effective 24/7 telemedicine services, and have formal letters of partnership intent signed by Family and Medical Counseling Service, Inc. and Mary's Center. Beyond that, as part of our planning and preparation for being awarded the contract, we have contacted an array of other local healthcare centers with requests for partnership to ensure we establish a broad community network.

Corizon Health advocates the philosophy that release-planning efforts begin during the intake process and continue through the continuum of

incarceration. Cognizant of this, we will continue the practice of incorporating discharge planning into the intake process, clinical assessing and planning treatment for all patients entering and leaving the DOC system.

The fundamental goals of our discharge planning process committed to the DOC are:

To help reduce recidivism;

To help increase public health and safety;

To assist the inmate patient in acquiring life skills they need to succeed in the community;

To increase the inmate patient's awareness of the symptoms of their illness;

To increase the inmate patient's awareness of how to care for their illness post release;

To increase the inmate's knowledge of the community resources available; and

To direct the inmate patient on where to go and how to access the care they need when released.

Mr. Chairman, I sincerely hope these responses address your questions to your satisfaction. Let me reiterate that we at Corizon Health have

put our faith in the District's procurement process, and hope you and your colleagues on the Council will do the same.

Sincerely,

Woodrow Augustus Myers, Jr., MD Chief Executive Officer

## ABOUT CORIZON HEALTH CORIZON ACCORDING TO THE DEBTOR

286.    Corizon Health is the nation's leader in correctional healthcare, providing quality healthcare services to 50 clients at 431 facilities across the country serving over 321,000 inmates in 25 states. With its corporate headquarters in Brentwood, Tenn. Corizon Health is the leading provider of correctional healthcare services in the United States. For more information, please visit www.corizonhealth.com.

287.    As the correctional healthcare pioneer and leader for 35+ years, Corizon Health provides client partners with high quality healthcare and reentry services that will improve the health and safety of our patients, reduce recidivism and better the communities where we live and work. We are a company built on innovation and expertise. Our people, practices and commitment to success through evidence-based medicine enable us to consistently meet and exceed client

expectations. See how Corizon is serving the healthcare needs in both jails and prisons.

288.     As the leading provider of correctional healthcare services in the United States, Corizon Health is uniquely positioned to meet the needs of both our clients and our patients. With the Corizon Health Vision, Mission and Values as our guide, we provide quality service to our patients, successful partnerships with our clients and an engaging work environment for our employees.

289.     Corizon Health will lead the industry by providing quality healthcare and inmate reentry services that ultimately improve the communities where we live and work.

290.     Corizon Health will exceed our correctional healthcare clients' expectations by partnering with them to deliver safe, effective and efficient services using clinical best practices and evidence-based medicine.

291.     Safety. We put safety first in all that we do. Motivation. We take pride in achieving excellence. We always strive to do better. Accountability. We honor our commitments. We do the right thing regardless of the situation.Respect. We treat every individual with dignity and compassion. We encourage the growth, development and

well-being of all employees. Teamwork. We value our team diversity. Our differences, backgrounds and experiences make us better.

## WHY SHOULD ONE CHOOSE CORIZON HEALTH ACCCORDING TO THE DEBTOR

292. There are nurses...and then there are Corizon nurses.

293. We have the right leaders with exceptional track records.

294. We don't just practice healthcare in a correctional setting. We practice the specialty of correctional healthcare.

295. We have an unmatched Clinical Services Department supporting the field to deliver care precisely and affordably.

296. We have created one of the largest and best correctional pharmacies in the nation.

297. From county jails to statewide prison systems, we deliver for every client partner.

298. We're not just the biggest. We're the best. Clinically-focused. Patient-centered. Evidence-based.

299. We're more than a vendor. We're your partner.

300. Our client partners love working with us. You will, too.

301. Our number one focus is patient health and safety.

# BENEFITS FOR CHOOSING   CORIZON HEALTH ACCCORDING TO THE DEBTOR

302.    As the leading provider of correctional healthcare services in the United States, Corizon Health is uniquely positioned to meet the needs of both our clients and our patients. With the Corizon Health Vision, Mission and Values as our guide, we provide quality service to our patients, successful partnerships with our clients and an engaging work environment for our employees.

303.    We recognize that a collaborative effort between the medical and behavioral healthcare providers is a key component of our delivery system and enhances the outcomes of our patients. Because of the high rates of mental illness and the previously unmet medical needs of the inmate population prior to incarceration, it is paramount to embrace a delivery system of this type. For example, in order for the special needs of individuals with chronic diseases such as HIV/AIDS, Hepatitis C, and cancer to be managed optimally, all disciplines must work diligently together. This integration of care by both the medical and behavioral health providers is a hallmark of Corizon Health's healthcare delivery system, whether we are the provider of comprehensive services or solely the medical or behavioral health provider.

304.    Corizon Health provides quality healthcare services to our clients at 429 facilities serving over 320,000 patients in 25 states. With its corporate headquarters in Brentwood, Tenn. Corizon Health is the leading provider of correctional healthcare services in the United States.

305.    Corizon Health's expertise in facilities accreditation can help you meet and exceed the standards of local, state and national agencies. We have extensive experience working with the National Commission on Correctional Health Care (NCCHC), the American Correctional Association (ACA), the National Sheriffs Association,(NSA) the American Jail Association,(AJA) the National Patient Safety Foundation(NPSF) and multiple local and state organizations.

306.    Whether or not a facility where we provide healthcare is accredited, awareness and compliance are part of our employee orientation, training and continuing education. NCCHC and ACA standards are the basis for our policy and procedures, as well as the foundation of our clinical and operational programs. Because of this, Corizon Health has a 100% success rate in obtaining and maintaining accreditation in every facility of ours in which accreditation is required.

307.    Corizon Health's company culture includes an emphasis on open communication and transparency, teamwork and accountability. These same goals provide the foundation for our corporate commitment to a culture of patient safety.

308.    Corizon Health recognizes excellence in patient safety as a journey, rather than a destination. We are always striving to enhance the quality of the healthcare we deliver, ever mindful of safety, efficacy and cost-effectiveness.

309.    Corizon Health has partnered with the National Patient Safety Foundation (NPSF) with the core mission of "improving the safety of care provided to patients." We are the first correctional healthcare provider to be a member of the "Stand Up For Patient Safety" organization and the only provider to have a Chief Quality Officer. Corizon Health is committed to:

310.    Enhancing teamwork and communication across the continuum of care at all levels of the organization.

311.    Seeking new resources to build organizational awareness for patient safety, employee engagement and accountability.

312.    Complementing current Corizon CE training with the NPSF Professional Learning Series.

313.     Facilitating Company-wide organizational learning and process improvements.

314.     Participating in NPSF Annual Patient Safety Awareness Week.

315.     Corizon Health has endorsed the NPSF report Free from Harm: Accelerating Patient Safety Improvement Fifteen Years after To Err is Human. As an endorsement organization we support and participate in the report's strategic recommendations for advancing progress in patient safety. Corizon Health is striving to achieve a meaningful, proactive, total systems approach, balanced with Corizon SMART values, as a roadmap to advance patient safety moving forward..

316.     Corizon Health's mission is to deliver safe, effective and efficient services using clinical best practices and evidence-based medicine. But along the way, we want to be effective and impactful members of the communities we call home. It starts with our employees. Their compassionate hearts find numerous ways to contribute to a number of programs, charities and other initiatives.

317.     Whether it's donations to local civic groups, running in local marathons or campaigns to raise money and awareness for international cancer research organizations, our employees show they care through a variety of outreach efforts. Our job is to provide care.

And we don't limit that to correctional healthcare. We care about our employees, our families and our communities. Listed to the left are some examples of Corizon Health team members' participation in local communities:

318.    Importance of giving blood highlighted for Corizon Nurse Donating blood recently became personal for a Corizon Health team member at Holmes Correctional Institution in Bonifay (FL). Crystal Pearson, LPN, who coordinates blood drives at Holmes CI, learned during a routine screening a few months back, that her blood level was extremely low. She was immediately referred to an emergency room, where she was given needed blood.

## VENDOR DIVERSITY PROGRAM (VDP) DESCRIPTION PER CORIZON

319.    Corizon Health has a company-wide commitment to promote the growth and development of qualified small, minority, women, and disadvantaged owned businesses ("Diverse Businesses"). This program, known as Corizon Health's Vendor Diversity Program, supports and fosters inclusiveness, diversity and economic development in the correctional healthcare industry through identification and evaluation of Diverse Businesses for contracting and

procurement activities. Corizon Health is dedicated to providing Diverse Businesses the opportunity to participate in all areas of procurement, including vendor, provider and supplier activities.

320.    Corizon Health has over 35 years of history working with local and small business, as well as an annual spend of over $55 million with diverse businesses across the country. Our efforts are designed to create and increase business opportunities for all by promoting job development and economic growth in the geographical areas where Corizon Health conducts business.

321.    Corizon Health strives to conduct business in a fair and ethical manner in keeping with its Code of Conduct and Business Ethics. The Corizon Health Vendor Diversity Program applies to all firms or institutions regardless of the business owner's race, color, religion, gender, gender identity or expression, sexual orientation, national origin, disability, age, or status as a special disabled veteran or other veteran. The Corizon Health program complies with all applicable federal, state and local laws, including anti-discrimination laws and laws governing the use of Diverse Businesses.

322.    Quality — We set high standards of performance for ourselves and the services we deliver. We expect the same from our vendors, in

areas such as quality, responsiveness, service commitments and transparency. These standards are detailed in the vendor contract agreement.

323.    Customer Focus — We seek companies that are committed to the same or better customer service goals and objectives.

324.    Cost Savings — We seek vendors who continually focus on ways to help us lower our costs through savings in all areas.

325.    Innovative Business Solutions — We want companies to join our team who are willing to work toward continuous quality improvement and more efficient products and services.

326.    Technology — We look favorably on companies who take advantage of technology to maintain a competitive edge and improve their responsiveness.

## WEXFORD HEALTH-CORIZON HEALTH-CENTURION AND HAPHCARE ARE ALL ALTREGOS OF EACH OTHER. HEN ONE LEAVES THE OTER CONTINUES WITH THE SCHEME

327.    September 21, 2012  Arizona Department of Corrections wrote to Karen Mullenix Wexford Health Sources 1850 N. Central Avenue, Suite 1050 Phoenix, Arizona 85004 stating that

- The purpose of this letter is notify you of a potential monetary sanction of ten thousand dollars ($10,000.00) to be imposed for non-compliance with the terms and conditions of the above referenced contract between Wexford Health Sources ("Wexford") and the Arizona Department of Corrections ("Department").

- The action is being made in accordance with the contract's Special Terms and Conditions, Section 2.19 Contract Monitoring General Requirements, paragraph 2.19.6 which states:

- 2.19.6 If non-compliance issues are identified or discovered, during a quarterly audit required under Section 2.20 or any other monitoring activity, whose gravity or severity cannot be mitigated by the Contractor's ability to bring its performance back into compliance at a future date, the Department Contract Monitor shall notify the Contractor's Arizona CEO and Area Manager in writing that the matter shall be referred to the Chief Procurement Officer to take action against die Contractor, including but not limited to monetary sanctions, suspension, refusal to renew, or termination of the Contract.

- This matter is being referred to the Chief Procurement Officer for immediate adverse action for, but not limited to, the following reason(s):

- An act of indifference that disregards a known and excessive risk to an inmate's health or safety or violates an inmate's civil rights.

- Failure to substantially meet an essential standard of the National Commission on Correctional Health Care ("NCCHC"), to the extent that the Contractor's ability to bring its performance back into compliance at a future date does not mitigate the gravity or severity of the non-compliance.

- Substantial failure to provide medically necessary services that the Contractor is required to provide under the terms of a Contract resulting from this Request for Proposal to the extent that the Contractor's ability to bring its performance back into compliance at a future date does not mitigate the gravity or severity of the non-compliance.

- Non-compliance identified or discovered, during a monitoring activity, whose gravity or severity cannot be mitigated by the Contractor's ability to bring its performance back into compliance at a future date.

- Failure to provide accurate and timely information to the Department or NCCHC.

- Failure to comply with any other NCCHC standards not identified in the contract.

- The circumstances are as follows:

    i.   On August 27, 2012, between approximately 0600 and 0630 hours, while conducting diabetic insulin line in the medical unit at ASPC - Lewis - Morey Unit, Licensed Practical Nurse (LPN) N. Nwaohia contaminated a vial of insulin being used on the line. This contamination occurred when LPN Nwaohia drew insulin with a syringe for a Hepatitis-C positive inmate from a vial of "Regular" insulin and injected this insulin into the inmate. Utilizing the same syringe, she then drew a second dose of insulin from a vial of "Lantus" insulin and injected the secondary dose into the same inmate. LPN Nwaohia's actions contaminated the multi-dose "Lantus" vial. This vial was then utilized to provide insulin to other insulin dependent inmates.

    ii.   Despite Wexford Nurse Lindsay Stephen becoming aware of this information on August 27, 2012, she did not file a report on the event until September 4, 2012. Rather, on August 27, 2012, she disposed of the insulin vials thought to have been involved in the contamination event and said nothing of the possible contamination event or her actions in destroying the insulin vials.

    iii.   In speaking with Wexford Site Manager Sumi Erno on September 7, 2012, she reports contacting Wexford Regional leadership on August

28, 2012, specifically, Linda Maschner to report the incident to her. Ms. Erno. reported being directed by Ms. Maschner to begin identifying IDDM inmates so baseline testing of them for Hepatitis-C could commence. As a precaution, baseline testing was also conducted for HIV. (The index inmate, although known to be positive for Hepatitis-C, was subsequently tested for both Hepatitis-C and HIV.) Pending receipt of those test results, plans were implemented to test all inmates potentially exposed through this event for both Hepatitis-C and HIV. Test results for the index inmate later confirmed him as positive for Hepatitis-C and negative for HIV.

iv.   In identifying these inmates, Ms. Erno initially reported on August 28, 2012, as having 105 inmates at Lewis that receive insulin. This number later changed to 103, based on a spreadsheet created by Wexford medical personnel at the Lewis Complex listing inmates receiving insulin at Lewis. In review of this list duplication of some inmates was noted, thus the 103 number derived from this list was determined questionable.

v.   Additionally, the Department received a report from Wexford generated from the online reporting system of their subcontracted Pharmacy (Diamond Pharmacy Service) on September 5, 2012, which

reflected 91 inmates receiving insulin at Lewis. In an email coinciding with the provision of this report, Wexford Director Karen Mullenix, stipulates the report was generated by Wexford's Site Manager at Lewis (Sumi Erno) and that she (Mullenix) has concern with the information Ms. Erno has provided thus far.

vi.    Due to the continued fluctuation of information from Wexford regarding the number of potentially impacted inmates and the clear lack of systems in place to readily identify insulin dependent inmates/chronic care inmates, ADC deployed the following resources to ASPC-Lewis to support Wexford and ensure all possible data sources were culled to determine a true number of potentially affected inmates:

- On September 5, 2012 ADC deployed an Audit Nurse Supervisor and an Audit Nurse

- On September 6, 2012, ADC deployed an Audit Nurse Supervisor, two Audit Nurses, a Pharmacy Monitor, Contract Monitor, and administrative support

- On September 7, 2012, ADC deployed an Operations Director, an Audit Nurse Supervisor, Contract Monitor and administrative support

- On September 6 and 7, 2012, ADC Health Service personnel and Wexford's Site Manager Sumi Erno and Director of Nursing Nicole

Armenia reviewed inmate Medical files/charts, Medical Administration Records and Diamond Pharmacy's ORP system; conducting comparative review of each to arrive at a comprehensive accounting of the total number of inmates thought to be on insulin. Upon conclusion of the review on September 6, 2012, the total number of inmates was determined to be 111.

- On September 7,2012, one additional insulin dependent inmate was identified who had not been previously identified increasing the total number to 112. This inmate was housed in the Inpatient Clinic which maintains its own/separate supply of insulin; thus this inmate would reportedly not have been affected by the cross contamination incident.

- Of the 112 identified inmates, eight inmates were determined to not have received insulin on September 27, 2012, as they were being treated with medication that did not require injection. Additionally, seven inmates were determined to have been "no shows" for insulin line on August 27,2012. Two showed for insulin line, but refused their insulin medication.

- Based on this data, it was determined that 94 inmates were at risk from the contamination of the "Lantus" insulin vial.

- Despite information to indicate that some inmates may not have been exposure candidates, such as the aforementioned that didn't show up for insulin line or refused insulin and/or where known carriers of Hepatitis C prior to the exposure event in conjunction with threat of HIV having been eliminated through HIV testing of inmate involved in the initial contamination event, it was determined during a teleconference with Jim Reinhart and Dan Conn on September 7,2012 that all 112 identified inmates would be baseline tested. This was prudent, based on the noted lack of records management, specifically the inability to readily identify chronic care insulin dependent inmates and the inability to locate Medication Administration Records for five inmates appearing on the list.

- Baseline testing occurred at ASPC - Lewis as follows:

- August 29, 2012 -        1 Blood Draw

- August 30,2012 -        40 Blood Draws

- August 31, 2012-        23 Blood Draws

- September 5,2012 -        4 Blood Draws

- September 6,2012 -        10 Blood Draws

- September 7,2012 -        <u>29 Blood Draws</u>

Total:                    107 Blood Draws

- Three inmates appearing on the list were transferred to Kingman before their blood could be drawn at Lewis and ADC made arrangements to have ASP - Kingman Medical complete blood draws on these inmates which were completed by September 10, 2012. ADC also made arrangement for these inmates to be provided information regarding the contamination event necessitating the testing through Kingman medical personnel.

- One inmate at Lewis refused to have his blood drawn and one other inmate was released prior to testing. Nicole Armenta, Wexford Director of Nursing at Lewis reported she had telephoned the released inmate's home and left a message for the inmate to contact her to arrange testing. As of September 11, 2012 there had been no known direct contact via Wexford with this inmate. On September, 11, 2012, ADC initiated contact with this released inmate through the Community Correction Bureau. The offender's assigned Community Corrections Officer conducted a site visit at the offender's home, during which the offender telephoned the ADC Contract Monitor at Lewis in the presence of his Community Corrections Officer. The offender informed

the Monitor that he had not taken any insulin on August 27, 2012 prior to being released. The offender was offered testing in accordance with the exposure protocol, which he declined and signed a Refusal to Submit to Treatment form 1101-4 on September 17, 2012, which was countersigned by his assigned Community Corrections Officer as a witness. Upon completion of the aforementioned testing, 110 of the potentially affected inmates completed baseline testing, and accounting for the two refusals, all 112 identified inmates have either been tested or offered testing.

- The aforementioned significant issues require corrective action. In accordance with the contract's Special Terms and Conditions, Section 2.19 Contract Monitoring General Requirements, paragraph 2.19.7, you have ten (10) calendar days to appeal in writing disputing a finding of non-compliance that results in either a cure notice or a decision to refer the matter to the Chief Procurement Officer for action.

328.    A second letter dated September 21, 2012 from Arizona Department of Corrections    to    Karen Mullenix Wexford Health Sources 1850 N. Central Avenue, Suite 1050 Phoenix, Arizona 85004 states that The purpose of this letter is notify you of details of non-compliance, required corrective actions, and timeline for action to the

CORRECTED VERIFIED ADVERSARY COMPLAINT  TRIPATI v TEHUM CARE
SERVICES INC  No: 23-90086 (CML) Page 113 of 182

above referenced contract between Wexford Health Sources
("Wexford") and the Arizona Department of Corrections ("ADC ").

- The action is being made in accordance with the contract's Special
  Terms and Conditions, Section 2.19 Contract Monitoring General
  Requirements, paragraph 2.19.5, which states:

- If non-compliance issues, other than those identified in Subsection
  2.19.6, are identified during a quarterly audit required under Section
  2.20, or any other monitoring activity, the Department Monitoring Staff
  shall provide a written cure notice to the Contractor's Arizona CEO and
  Area Manager regarding the details of the non-compliance, the
  required corrective action, and the period of time allowed to bring
  performance back into compliance with Contract requirements.

- If, at the end of the specified time period, the Contractor has complied
  with the cure notice requirements, the Department shall take no
  further action.(2.19.5.1)

- If, however, the Contractor has not complied with the cure notice
  requirements, the Department Contract Monitor shall notify the
  Contractor's Arizona CEO and Area Manager in writing that the
  matter shall be referred to the Chief Procurement Officer to take action
  against the Contractor, including but not limited to monetary

sanctions, suspension, refusal to renew, or termination of the Contract. (2.19.5.2)

• Several events detailing significant issues of non-compliance are described below:

1. *August 17, 2012, ASPC-Perryville/Lumley Unit*

• On August 17, 2012, Wexford nursing personnel were distributing medication on Lumley Unit - Yard 24 to include "watch swallow" medications. In accordance with "watch swallow" protocols, certain medications in powder form require administration to be completed via "floating" the medication in a small cup of water, which the patient drinks. During this distribution of medication, Wexford nurses depleted their stock of cups prior to completing medication distribution to the inmate population. Wexford nurses tailed to stop the medication line and retrieve additional plastic cups, as would have been appropriate. Rather than refilling the supply of cups, a Wexford nurse placed the powdered "watch swallow" medication in an inmate's hand, directing the inmate to lick the powdered medication from her own hand.

- This improper administration of medication instigated disorderly behavior by the affected inmate, requiring a security response. The nurses' disregard for proper protocol in administering this inmate's medication and their disrespect for the inmate are significant non-compliance issues that require corrective action.

*2. August 22, 2012, Medication Expiration Report (Statewide)*

- During the month of August 2012, ADC conducted random reviews of prescriptions, utilizing the Medication Expiration Report published by Wexford for July 1 - August 11, 2012. In completing this review, ADC learned that a significant number of inmates may not have been receiving their medications as prescribed due to expired prescription(s) and inappropriate renewals or refills. Approximately 8,358 prescriptions required review and potential renewal to ensure inmates received their required medications.

- Wexford's lack of communication to its field supervisors regarding the necessary process for reviewing the Medication Expiration Report for renewal of medication, together with Wexford's delayed response and

lack of urgency to correct the identified problem, contributed to this significant non-compliance issue. Specifically, during a meeting on August 22, 2012, between ADC's Monitoring Bureau leadership and Wexford Regional and Corporate personnel, it was apparent, based on statements from Wexford's Corporate Pharmacist, Denise Mervis, Pharm.D., that Wexford was aware of the expired medication issue, but had not taken adequate, if any, action to correct it. In this meeting, Dr. Mervis referred to the expired medication renewals as a critical issue.

- When asked on August 22, 2012 what actions Wexford had undertaken to correct this problem, Wexford leadership advised that they intended to conduct an initial review of the July 1, 2012 - August 11, 2012 Medication Expiration Report beginning August 27, 2012. Wexford's decision to wait five days to begin reviewing the Medication Expiration Report was an inadequate response to a significant issue of grave concern to ADC. As a result of Wexford's delayed response, ADC deployed State resources on August 23, 2012 to ADC prison complexes statewide to review various data sources in an effort to identify inmates in need of medication renewal and to ensure that renewal actually occurred. Multiple ADC prison complexes also enhanced security vigilance by increasing the rate of security checks to 30-minute

intervals on all inmates to ensure the well-being of the inmate population.

### 3. August 23, 2012, ASPC-Florence/Central Unit

- On August 23, 2012, an inmate was found hanging from a sheet in his housing location. ADC staff removed the sheet, placed the inmate on a gurney, and arranged for air transport to an outside hospital. The inmate (MH-3) was last seen by an ADC psychiatrist provider on May 1, 2012. At that time, the provider prescribed lithium carbonate, a "watch swallow" medication used as a mood stabilizer, for 180 days. Medication Administration Records (MARs) showed this inmate received his medication in May, June, and July. On July 18, 2012, during a psychiatric follow-up, the inmate reported that the lithium carbonate had been helpful in stabilizing his mood. During ADC's investigation of this incident, ADC determined that this inmate had not received his psychotropic medication for the first 23 days of August 2012, as evidenced by the feet that no MAR had been generated.

Failing to deliver psychotropic medication as prescribed is a significant, non-compliance issue.

4. *August 27, 2012, ASPC-Lewis/Morey Unit*

- On August 27, 2012, between approximately 0600 and 0630 hours, while conducting diabetic insulin line in the medical unit at ASPC - Lewis - Morey Unit, Licensed Practical Nurse (LPN) N. Nwaohia contaminated a vial of insulin being used on the line. This contamination occurred when LPN Nwaohia drew insulin with a syringe for a Hepatitis-C positive inmate from a vial of "Regular" insulin and injected this insulin into the inmate. Utilizing the same syringe, she then drew a second dose of insulin from a vial of "Lantus" insulin and injected the secondary dose into the same inmate. LPN Nwaohia's actions contaminated the multi-dose "Lantus" vial. This vial was then utilized to provide insulin to other insulin dependent, inmates.

- Despite Wexford's Nurse Lindsay Stephen becoming aware of this information on August 27, 2012, Ms. Stephen did not file an Incident Report on the event, in accordance with ADC policy, until September

4,2012. Rather, on August 27,2012, she disposed of the insulin vials thought to have been involved in the contamination event and failed to notify Wexford management or appropriate ADC staff of the contamination event or her actions in destroying the insulin vials.

- Wexford Site Manager Sumi Erno reported contacting Wexford Regional Manager Linda Maschner on August 28, 2012, to report the incident to her. Ms, Erno reported being directed by Ms. Maschner to begin identifying Insulin Dependent Diabetes Mellitus (IDDM) inmates so that baseline testing for Hepatitis-C could commence. As a precaution, baseline testing was also conducted for HIV. (The index inmate, although known to be positive for Hepatitis-C, was subsequently tested for both Hepatitis-C and HIV.) Pending receipt of those test results, plans were implemented to test all inmates potentially exposed through this event for both Hepatitis-C and HIV. Test results for the index inmate later confirmed him as positive for Hepatitis-C and negative for HIV.

- Also, on August 28, 2012, upon direction of Wexford Management, Wexford RN Supervisor Sienkiewicz contacted AB Staffing, the subcontracted employer of LPN Nwaohia. Ms. Sienkiewicz reportedly advised AB Staffing that LPN Nwaohia would be prohibited from

performing nursing services in support of Wexford contracts in the state. Wexford requested that AB Staffing file a complaint with the Arizona State Board of Nursing regarding LPN Nwaohia's actions. One week later, on September 4, 2012, while following up at ADC's request, Wexford learned that no complaint regarding LPN Nwaohia had been received by the Board. Wexford Regional Manager Maschner then formally submitted the complaint on the afternoon of September 4, 2012.

- In identifying IDDM inmates, Ms. Erno initially reported on August 28, 2012, as having 105 inmates at Lewis that receive insulin. This number later changed to 103, following review of a spreadsheet created by Wexford medical personnel at the Lewis Complex listing inmates receiving insulin at Lewis. In review of this list, duplication of some inmates was noted, thus the 103 number derived from this list was determined questionable.

- Additionally, the Department received a report from Wexford generated from the online reporting system of their subcontracted Pharmacy (Diamond Pharmacy Service) on September 5, 2012, which reflected 91 inmates receiving insulin at Lewis. In an email coinciding with the provision of this report, Wexford Director Karen Mullenix, stipulated

that the report was generated by Wexford's Site Manager at Lewis (Sumi Emo) and that she (Mullenix) had concerns with the validity of the information Ms. Erno had provided thus far.

- On September 5, 2012, during a meeting with inmates at ASPC-Lewis, an additional 9 inmates not previously identified by Wexford were added to the list of those potentially exposed.

- Due to the continued fluctuation of information from Wexford and the lack of systems in place to readily identify insulin dependent/chronic care inmates, ADC deployed additional compliance monitoring staff to ASPC-Lewis on September 5, 6, & 7. Wexford did not deploy additional resources to the site until September 6, 2012. It was not until Friday, September 7, 2012, that the total population of insulin dependent inmates and the subset of potentially exposed inmates were identified with certainty. Further, baseline testing of this population was not completed until September 10, 2012, despite Wexford's earlier reporting that this had been completed on September 4, 2012.

- The failure to follow established nursing protocols, poor record keeping, mismanagement of documentation, inadequate and inaccurate communication, lack of timely managerial or administrative support,

and failure to ensure that corrective action had been completed represent serious issues of non-compliance.

5. *September 13, 2012, ASPC-Perryville/Santa Rosa Unit*

- On September 13, 2012, at approximately 1715 hours, Wexford Director Karen Mullenix notified ADC of a possible case of pertussis (whooping cough) at ASPC-Perryville. Wexford management did not know the name(s) or number(s) of inmate(s) affected, or the unit(s) identified with the reported case. Wexford's notification of the reported pertussis case was inadequate and inconsistent. Further, without sufficient factual detail of the incident, Wexford reported no action plan to address the situation.

- Ms. Mullenix further reported that Wexford's Dr. Palmer spoke to both the County and State Health Departments about the case. She also reported that Dr. Bell (Regional Medical Manager) was called about this issue two days prior, September 11, 2012, and although he was aware of the potential diagnosis, that information had not been communicated to either Ms. Mullenix or the ADC Site Monitors. ADC Audit Nurse Mendoza contacted Wexford facility personnel and

determined that an inmate tested positive for pertussis on August 13, 2012, approximately 30 days prior to Wexford's notification to ADC. ADC Audit Nurse Mendoza also confirmed the inmate's name, number and location.

- In a phone conversation later that evening with Site Manager Deb Cherry and Richard Pratt, ADC Interim Assistant Director, Health Services Monitoring Bureau, it was reported that Dr. Palmer had seen the inmate who tested positive for pertussis approximately 10 days prior to Wexford's notification to ADC. Ms. Cherry also advised she was aware of this issue up to 10 days prior and failed to advise either Ms. Mullenix or ADC Site Monitors at that time. During ADC's investigation, Ms. Cherry speculated that the patient may have unknowingly contracted the disease through inmate visitation in the past few weeks, as the inmate was later contacted by her visitor to advise she or her child had been diagnosed with pertussis. Ms. Cherry also reported that Dr. Palmer contacted the County Health Department regarding the case and that she ordered 25 test kits from the Maricopa County Health Department to test any additional suspected cases of pertussis. That, in fact, was not the case. Ms. Cherry sent an "undeliverable" e-mail to the County's website, requesting the test kits.

- A known case of a reportable infectious disease went unreported to ADC staff and Wexford State Level Management for 30 days, indicating a lack of urgency, a lack of awareness of the situation's potential seriousness, a breakdown of communication between field personnel and management, or all of the above. Further, Wexford's failure to independently engage in developing a plan by which to identify/confirm current and future suspected cases of pertussis is a significant non-compliance issue.

- The aforementioned significant events have necessitated ADC to substantially supplement Wexford with personnel resources, operational modifications, and specific direction that should not be expected and are not required under this contract. ADC expects Wexford to effect sustained, systemic operational improvements in the management and delivery of health care services to ADC inmates. ADC is not contractually obligated to deploy its resources to manage Wexford's day-to-day, as well as crisis operations.

## CENTURION FOLLOWS CORIZON , WEXFORD, AND IS PRECEDED BY NAPHCARE USING THE CORIZON MODEL

329.    Centurion has followed the evolution of the ADC healthcare program for many years, and we are grateful to have had the opportunity to engage with the ADC over the years and to participate in the previous RFPs in 2012 and 2016.  We are well aware of the current challenges faced by the ADC in relation to the Parsons v Ryan litigation and the stringent service requirements and auditing processes tied to the stipulation agreement.  Our conversations and dialogue with the ADC provided us with a better understanding of and appreciation for the ADC's goals and objectives, the challenges it has faced over the past few years in providing quality services to its inmate population, and its requirements and expectations.

330.    The ADC's current RFP has provided us with continued opportunities to place the ADC's scope of work within a better financial and strategic framework.  We applaud the ADC for the changes it has made in its current RFP, including a more realistic pricing structure, provisions permitting the Department and contractor to negotiate amendments if and when there are material changes in the scope of required staff and/or services, and detailed staffing information.  These changes, in combination with the ADC's increase in healthcare staffing levels in the current RFP versus the

previous RFP, were augmented by very helpful site visits attended by our operational and clinical leaders. We have much greater insight into the staffing needs of each facility and our proposed staffing pattern for each ASPC is in line with the ADC's needs and expectations. The new RFP's adjustments assure a higher level of confidence that a successful and commercially viable contract will result. We believe that our new proposal reflects our higher level of insight into the ADC today and is more responsive to the ADC's needs.

331. Our proposal also reflects the changes that Centurion has undergone since our last submission. These changes have made our organization stronger and our services more impactful. Previously, Centurion was a joint venture started in 2011 between MHM Services, Inc. and Centene Corporation. In April of 2018, Centene purchased MHM to consolidate MHM's and Centurion's correctional lines of business, as well as other non-correctional lines of business of MHM, under the Centene corporate umbrella. This transaction ensures the continuing delivery of an innovative approach that considers national healthcare reforms and views correctional health as an integral component of public health. As fully integrated within the Centene corporate structure, Centurion is better able to align its services with

other company resources, including in Arizona where Centene operates Bridgeway Health Solutions, Allwell, Cenpatico/Arizona Complete Health, and HealthNet as service agencies providing a wide array of healthcare services to Arizona residents from children through senior citizens.

332.    Centurion is pleased to announce the recent award and startup of a new contract with Pima County, Arizona to provide comprehensive healthcare services to detainees of the County's adult and juvenile detention facilities located in Tucson, Arizona. This new, three-year contract, which started July 1, 2018, requires 108 full-time equivalent employees to work at the County's detention facilities providing a wide array of medical, dental, and behavioral health services to the County's daily population of approximately 1,900.

333.    Since our last submission, our parent company, Centene, has expanded its presence in Arizona. In March 2018, Centene announced that it will begin offering Ambetter, a Centene health maintenance organization (HMO) plan, and Cenpatico Integrated Care, a regional behavioral health authority, in Maricopa and Pima Counties. Ambetter and Cenpatico are now known as Arizona Complete Health. Their expansion from other southern counties in

Arizona means Centene is now able to offer services in Cochise, Gila, Graham, Greenlee, La Paz, Maricopa, Pima, Pinal, Santa Cruz, and Yuma counties as well as on the San Carlos Apache Reservation.

334. Today, our parent company, Centene, currently serves approximately 500,000 Arizona residents with over 2,000 employees and 15 regional offices in the state and affiliations with a provider network of over 14,000 clinical professionals and 89 hospitals.

335. "The next generation of correctional healthcare...today"

336. Centurion was formed in 2011 by two of the oldest and most respected companies in correctional healthcare and Medicaid managed care: MHM Services, Inc. and Centene Corporation.

337. In developing Centurion, MHM and Centene sought a more innovative approach that considers national healthcare reforms, viewing correctional health as an integral component of public health. We brought together the expertise of MHM, the leader in

338. providing correctional mental health services, with those of Centene, a Fortune 100 company and leading provider of managed care services for state Medicaid programs and other populations. We created a model of correctional healthcare that combined managed care components developed and perfected in large state Medicaid

programs into the coordination and management of care for inmate populations.   The Centurion model works.   Today, Centurion, combined with our co-founder company MHM, serves over 300,000 inmates in more than 250 facilities nationwide.

339.   An important component of this model is our view that correctional healthcare is an integral  component of the overall public health system.  We understand that most inmates enter facilities with undiagnosed and unmet healthcare needs.   For many, their first encounter receiving needed medical, dental, and mental health services occurs upon entering the system.   With close to 95% of incarcerated individuals eventually returning to the community, inmate healthcare becomes integral to maintaining the health of the community.   To reduce post-release recidivism for inmates with medical issues, access to and partnerships within the non-corrections healthcare system is equally essential.

340.   Our experience has shown that the most effective healthcare partner for any municipality is an organization that understands the important role that correctional healthcare plays in public health and has worked in and understands both the corrections and healthcare systems at a local level.   Such an organization can provide the

required medical services, while also utilizing its presence in the community to assist inmates bridge the gap between the corrections and non-corrections healthcare systems. Centurion is that company.

341.     Most correctional healthcare contractors fail to understand that, for inmates who will be rapidly returning to the community, having access to, and partnerships within, the non-corrections healthcare system is essential to reducing recidivism for inmates with behavioral health and/or medical needs. The most effective healthcare partner for the ADC is an organization that understands and has worked in both the corrections and healthcare systems in the state. Such an organization can provide the required medical services, while also utilizing its presence to assist inmates bridging the gap between the corrections and non-corrections healthcare system.

342.     Centene have long-standing ties and networks of providers and services across the nation. For example, Cenpatico Integrated Care, a Centene company, functions as the southern Arizona Regional Behavioral Health Authority (RBHA) to provide integrated whole person healthcare services for children and adults with behavioral health services enrolled with Arizona Health Care Cost Containment System (AHCCCS) and residing in the southern counties of the state.

343.    Centene's Bridgeway Health Solutions (Bridgeway) provides Medicare advantage plan services under Allwell from Health Net.

344.    Bridgeway also provided long term care managed health plan services to people who are enrolled with Arizona Health Care Cost Containment System (AHCCCS) from 2006 to 2017.

## NAPHCARE FOLLOWS CENTURION USING THE CORIZON MODEL

345.    In order to get the Arizona contract Naphcare made the following representations, same as Corizon, Wexford, Centurion.

346.    For more than 30 years, NaphCare has been devoted to partnering with federal, state and local government agencies to provide proactive, preventive healthcare to incarcerated individuals across the country. We welcome the opportunity to bring our partnership, expertise and innovative solutions to the Arizona Department of Corrections, Rehabilitation and Reentry (ADCRR).

347.    We are prepared to partner with the ADCRR in addressing the challenges ahead. At NaphCare, we consider our clients to be partners. Through collaborative partnership, mutual trust and transparency, we are best able to ensure the success of our programs — meaning the success of our partners. We are confident in our ability to succeed where other contractors have failed the ADCRR, bringing our

incomparable client services and partnership to you and your residents.

348.    We have followed the legal proceedings  regarding Jensen v. Shinn, and we are confident that we can partner with the ADCRR to achieve 100% compliance with these and any future requirements moving forward. We have outlined in this proposal how NaphCare's innovative solutions will help to improve your success rate in achieving those and any future measures.

349.    NaphCare is prepared to partner with ADCRR to achieve your goals through our proactive, patient-centered approach to health and wellness. We have proposed for ADCRR a healthcare service delivery plan designed to:

350.    NaphCare's Arizona Footprint

- Maricopa County Correctional Health Services


- Services Provided: TechCare EHR
- ADP: 8,000


- Pima County Dept. of Behavioral Health
- Services Provided: Medical, mental health,

dental, TechCare EHR, third-party

administration

- ADP: 1,900

- Federal Correctional Institution – Phoenix

- Services Provided: Specialty Care and Hospital

- Services, Third-party Administration

- ADP: 1,300

- NaphCare Arizona Corporate HQ*

- Executive, Clinical and Operations Leadership

- Dedicated Arizona Recruiting team

- 12-member STATCare 24/7 telehealth team

351.    Based in Phoenix, NaphCare's Chief Medical Officer, Dr. Jeffrey

Alvarez, will be instrumental in implementing a healthcare program

designed for the ADCRR. Dr. Alvarez serves on the NCCHC Board of

Directors and Accreditation and Standards committee, on which he chaired the 2018 revision of the NCCHC Standards. As a Physician Surveyor for the accreditation program, he has audited sites nationwide, including those in the ADCRR system.

352.   Dr. Alvarez will lead a 12-member Arizona-based STATCare team of licensed providers dedicated to continuously reviewing all ADCRR sites and working with state compliance monitors to ensure the sites are meeting all established quality measures.

353.   NaphCare Leadership – Dr. Jeffrey Alvarez, Chief Medical Officer

354.   NaphCare plans to open an office in Phoenix if awarded the ADCRR contract.

355.   Established Arizona Network 30+ hospitals in AZ network 250+ Specialty physicians in AZ network 760,000+ Medical records in TechCare for AZ patients.

356.   Choosing NaphCare means a guaranteed level of continuity of care – more than 72% of commitments to the ADCRR are from Maricopa and Pima Counties with existing health records within our EHR, TechCare Continuity of Care with TechCare EHR

357.    Existing Interfaces with Arizona State IT Systems Regional Behavioral Health Authority (RHBA)

358.    156 Current NaphCare employees in AZ 54 New hires to be located in NaphCare AZ office1,161 FTEs in proposed staffing for ADCRR system

359.    NaphCare: Innovating to Improve Lives NaphCare is committed to advancing correctional healthcare through innovative technology, our proactive care and wellness model, and evidence-based programs aimed at preparing patients for successful community re-entry. We understand the challenges that the ADCRR faces at this time, and we look forward to bringing our innovative solutions to you.

360.    With NaphCare, you'll see innovation in every aspect of our care delivery — all aimed at improving patient outcomes and preparing residents for a safe and healthy return to the community to reduce recidivism.

361.    As a health services and technology company, we are uniquely positioned to innovate with ADCRR. With our in-house team of software engineers and information systems and data-analytics experts, we offer a multi-disciplinary approach that ensures our

technology and services are designed specifically for the corrections environment.

362.     With our expansive network of partnerships spanning local, state and federal government, NaphCare has a bird's eye view of the complexities and distinctive needs of our clients. From innovating models of patient care and designing custom EHR solutions to developing reliable specialty care and hospital networks and sophisticated claims management systems – NaphCare will bring our multi-faceted expertise to ADCRR to develop a comprehensive solution that meets your goals.

363.     As one of the largest correctional healthcare companies in the U.S., NaphCare retains a defining characteristic – delivering both the strength and reliability of a large company and the nimble responsiveness of a small business. As a family-owned company, NaphCare has never sought the support of outside investors or private equity – allowing us to maintain our focus on serving the interests of our patients and clients. While other companies engage in frequent mergers and acquisitions, we remain under consistent leadership with an unwavering mission.

364.     Partnering with NaphCare to Achieve ADCRR's Goals

Optimize Staffing – Retain, Recruit and Train Our goal is to do more than meet the court's directives – we aim to significantly improve patient outcomes through greater access to quality medical and mental health care. To do so, we have proposed a staffing plan that increases site staff above RFP requirements and enhances clinical support via NaphCare's innovative telehealth team, STATCare.

365.    Additional Staffing for Improved Outcomes – Many of the current performance measures can be directly tied to two areas of improvement – patient access to care and timeliness of the delivery of care. To address both areas, we believe additional staffing is necessary across the ADCRR system. We have proposed staffing to elevate direct patient care in areas such as mental health, addiction treatment, infection control and multiple specialties to provide onsite clinics.

366.    Retain and Retrain Current ADCRR Health Staff – We understand that the people  who will have the best understanding of the ADCRR's unique needs and daily operations are the current healthcare staff. By retaining and retraining these employees, we ensure that continuity of care is maintained and healthcare quality does not suffer during transition of services. All retained staff

complete Team NaphCare orientation prior to transition to integrate into The NaphCare Way.

367.     Arizona-based Recruiting Team – To meet increased staffing levels and ensure contract compliance, NaphCare will dedicate two Arizona-based Recruiters to ADCRR. Due to competition created for nurses by the COVID-19 pandemic and the nationwide healthcare staffing shortage, everyone is experiencing a historically challenging recruitment and retention market. Despite this, we have fared better than our competition by being proactive and creative in our recruiting programs –including introducing incentive and bonus pay structures, implementing proactive recruiting strategies, employing PRN pools and establishing academic partnerships.

368.     STATCare 24/7 Telehealth Team STATCare is NaphCare's innovative approach to providing 24/7 access to providers via telehealth. For ADCRR, a dedicated STATCare team of 12 providers – eight (8) medical and four (4) psychiatric – will be based in our Arizona office to provide an added layer of quality assurance and clinical support to site teams throughout the state. With access to patient records in real-time via TechCare, STATCare providers will be available for patient encounters, as well as peer-to-peer consults and

24/7 on-call services, ensuring a prescriber is available around-the-clock.

369.    Transparency and Compliance with TechCare HER Our corrections-specific EHR and medical management system, TechCare, is designed specifically to provide efficiency, accountability, transparency and consistency in correctional systems. NaphCare clinicians will document every healthcare interaction in TechCare, providing the ADCRR with a source of proven compliance with performance measures to provide for the court. Because TechCare is a NaphCare product, we are able to customize the system for the specific performance measures required by ADCRR and provide routine reports to ADCRR and Court Monitors, proving compliance and quality of care provided.

370.    Compliance Reporting with TechCare – TechCare has a robust platform for quality charting that ensures detailed logging and documentation without loopholes, supporting chart audit and litigation activities seamlessly and instantly. NaphCare has successfully partnered with clients to comply with and overcome consent decrees, including collaborating with the Maricopa County Sheriff's Office (AZ) in overcoming a 40-year consent decree. We are

currently providing New Hampshire DOC with specialized reporting to achieve the same results.

371.    Our client in Maricopa County, Arizona was under court supervision since 1977 via the Graves, et al. v. Penzone, et al case. In 2012, the County licensed with NaphCare to use TechCare EHR. We customized TechCare to account for all court-ordered compliance standards and provided iron-clad documentation of compliance to the court. In 2019, the case was closed in part due to NaphCare's ability to provide all required reporting, including retrospective reporting to prove continued compliance.

372.    In New Hampshire, NaphCare currently provides extensive reporting designed to provide metrics supporting timeliness of care in compliance with a court order for supervision established 30 years ago. New Hampshire DOC contracted with NaphCare in 2016 to use TechCare EHR. We customized provider queues, workflows and documentation to ensure compliance with court orders.

373.    Continuity of Care with TechCare – TechCare  is designed to standardize, automate and track healthcare delivery across complex correctional systems. Each patient has a single paper-less record in TechCare that covers all aspects of healthcare while incarcerated that

is accessible to all users. As a cloud-based solution, the complete patient record, including all treatment planning, follows the patient if transferred within the ADCRR system to ensure continuity of care.

374.    Data-driven Decision Making – Guaranteed to be operational on day one, TechCare will be tailored to the operational workflows and requirements of the ADCRR's facilities,

ensuring the capture of meaningful data for better data-based decision-making and improved patient outcomes.

375.    NaphCare's mission is to improve and save lives. United by this mission, we work as a team to improve each and every life we touch. Our integrated approach to healthcare is patient-centered, with the goal of improving the physical and mental health and wellness of each patient. Additionally, NaphCare's policies and procedures are designed to ensure compliance with all federal, state and local requirements, as well as NCCHC and ACA standards.

376.    Improving Patient Outcomes through Proactive Care – NaphCare emphasizes the proper identification of medical, mental health and substance use issues in order to intervene early and establish individualized treatment plans for timely and appropriate care. Our Proactive Care Model involves a focused review of each patient's

baseline status, diagnostic and assessment findings, as well as establishing anticipated needs based on age, gender, physical and psychosocial status. We apply this model upon reception into the system. Each patient's total health is reviewed by a clinician at our first encounter and integrated medical and mental health treatment is initiated to minimize adverse outcomes.

377.    Healthcare within a prison requires long-term strategies to improve and sustain "whole person" health and wellness. Our clinicians will have the opportunity to help residents establish long-term wellness habits with the goal of improving outcomes during incarceration and continuity of care upon re-entry. For ADCRR residents, NaphCare will implement our targeted MyCare Wellness Program that emphasizes the importance of treatment compliance and preventive healthcare through patient education to give patients more autonomy in their personal care. MyCare is a voluntary, evidence-based patient program, designed to support positive behavioral change. MyCare equips individuals with the knowledge and skills needed to make healthy life choices, which in turn, can reduce emergent healthcare needs while incarcerated and decrease rates of recidivism and relapse after release.

378.    NaphCare has a 100% success rate in acquiring and maintaining accreditation. We back this with a commitment to cover the accreditation fees, including annual recurring dues. Our core policies, procedures and reports are designed to be consistent with NCCHC standards, and our electronic health record (EHR) is designed to ensure compliance with NCCHC and ACA standards.

379.    Advanced Onsite Health Services – At NaphCare, we aim to provide the highest level of patient care onsite to decrease costs associated with community-based services and custody transport. We monitor and analyze treatment trends to identify opportunities to bring specialty clinics onsite when warranted by the volume of patient need. Our goal is to optimize the use of onsite healthcare facilities to limit disruptions to your daily operations and officer schedules.

380.    Part of our strategy is ensuring that all patients, even those with barriers related to housing status or communication obstacles, have consistent access to healthcare services. To connect patients with health information and education 24/7, NaphCare will create a patient interface with TechCare on the ADCRR's tablets distributed to residents and/or NaphCare-supplied kiosks. Through the portal, patients can submit sick call requests and grievances, view

information related to health requests and access health and wellness educational resources.

## THE CONSPIRACY AMONGST DEFENDANTS TO ENGAGE IN SPOLIATION AND THEN PREVENT THE CLAIMS FROM BEING HEARD

381.    Defendants knowingly intentionally made intentional deliberated decisions to disobey disregard the law. They were unaware of all the participants, but were aware of the essential nature and general scope of the conspiracy, which was to engage in the conduct above    , to frustrate   my litigation, and deny me access to evidence favorable to me and inculpatory to themselves.

382.    Defendants pursued the object of the conspiracy by performing what their part of the conspiracy was and another defendant performed another part, willfully agreeing to participate with the common design to deprive me of the rights    I complain of in this litigation.

383.    By and through the use of the unlawful means in this complaint, through the overt acts in this complaint, which overt acts were committed in furtherance of the conspiracy discussed above, each of them ensured the conspiracy continues and succeeds, which conspiracy is open ended and continues to this date.

384.    Each of these Defendants are professionals who under no set of circumstances did not know that the wrongs   I complain of were not unlawful. THEY REFUSED TO SPEAK UP OR DISASSOCIATE THEMSELVES FROM THESE ACTS. It is difficult to understand that with all this professional talent, why one of them would not blow the whistle.

385.    Each individual willfully agreed to become members of the conspiracy agreeing to participate directly/indirectly in the conspiracy. They knew of the conspiracies to deny   me equal protection, equal privileges, had the power to prevent or aid in the prevention of the commission of the conspiracies, could have with reasonable diligence, but neglected or refused to prevent the conspiracies.

## ALLEGATIONS COMMON TO ALL SCHEMES

386.    These acts or activities in paragraphs were authorized, requested, commanded, ratified or recklessly tolerated by the unlawful conduct of the other. The Directors, higher management, agents performed, authorized, requested, commanded, ratified, or recklessly tolerated the unlawful conduct of the agents.

387.     When Defendants obtained signatures by deception with the intent to defraud by knowingly misrepresenting or omitting fact material to the transaction in the declaration, they committed forgery/

388.     When Defendants pursuant to their scheme or artifice to defraud, knowingly obtained any benefit, by means of false or fraudulent pretenses, representations, or material omissions, they engaged in conduct that is fraudulent.

389.     As Defendants knew that the assets of the assets of the Correctional Health enterprise and the Debtor, involved in the financial transactions, represented some form of unlawful activity, by conducting or attempting to conduct the financial transactions, which in fact involves some form of unlawful activity, with the intent to carrying on the unlawful activity.

390.     Defendants knowing that the transaction was designed in whole or part to conceal or disguise the nature or control of proceeds of the specified unlawful activity, or to avoid the transaction reporting requirements under state or federal law, partook in the conduct.

## THE BANKRUPTCY FRAUD SCHEME BY CORIZON

391.     Concealment of assets 18 USC § 152(1), false oaths 18 USC § 152(2), false declarations or false statements under penalty of perjury

18 USC § 152(3), embezzlement form the estate of the debtor 18SC § 15, money laundering 18 USC § 1956 are predicate acts cognizable as racketeering unlawful activity under RICO 18 USC § 1961(1)(A)(B)(D) and ARS § 2301.D.4(b)(iv)Iv)(xx)(xv) that make this scheme.

392.    After Scott King Corizon General Counsel submitted requests for pandemic related federal funds  for all venues that Corizon was operating under During the period January 2020 through January 2021 Corizon obtained funds authorized by 12 USC 4703a; 15 USC 636; 15 USC 9001; 15 USC 9009a; 15 USC 9011; 15 USC 9051; 21 USC 21516; 22 USC 4801; 42 USC 234; 42 USC 603; 50 USC 4532; amongst others, for the 25 contracts cancelled.

393.    He  submitted reports with false declarations that the funds were used to pay employees  .

394.    Corizon sent emails to all management staff upon approval of Sara Tirschwell directing them, to have employees work at least 16 hours daily, and if they did work, they should not be paid overtime, and the Managers shall get bonuses.

395.    The emails also informed managers not to have inmates go to hospital, see specialists, and of hey die, so be it.

396.    The Managers implemented the emails and received bonuses.

397.    In   furtherance   of   the   scheme   Sara   Tirschwell;   Valitas Intermediate Holdings Incorporated, a Delaware Corporation; M2 HoldCo LLC, a Florida Limited Liability Co; M2 LoanCo LLC, a Florida Limited Liability Co; M2 EquityCo LLC, a Florida Limited Liability Co; Becken Petty O'Keefe, a Delaware Corporation, ( hereinafter Valitas Family Of Companies),   all through mail and emails from and to ch.com determined that Corizon reorganize in Texas.

398.    They agreed to form Tehum Care Services Inc aka Corizon a Texas Corporation; YesCare Corporation, a TexasCorporation and CHS Tex, a Texas Corpration. Never has Corizon maintained its place of business in Texas. It has always maintained its principal place of business in Tennessee. This was all accomplished by emails sent from corizonhealth.com (hereinafter "ch.com")

399.    They agreed to transfer bulk of the assets to CHS TEX, liabilities to Yescare and bonds and policies to Tehum. This reorganization was a sham designed to defraud.

400.    They then as planned filed for bankruptcy.

401.    The Ankura consulting was hired to conduct due diligence. Russell Perry of Ankura did not examine the financials as he should

have, especially the use of COVID funds, and any claims against Corizon for spoliation of evidence.

402.　　M2 HoldCo LLC, ;M2 LoanCo LLC;  M2 EquityCo LLC, agreed to give Coriozn loans from monies laundered from the assets of Corizon. These were sham loans.

## THE SCHEME TO PERPETATE FRAUD BY DEFENDNTS

403.　　Mail Fraud 18 USC § 1341, wire fraud 18 USC 1343, Concealment of assets 18 USC § 152(1), false oaths 18 USC § 152(2), false declarations or false statements under penalty of perjury 18 USC § 152(3), embezzlement form the estate of the debtor 18SC § 15, money laundering 18 USC § 1956, fraudulent schemes ARS §13-2310; forgery ARS § 13-2003 Concealment of assets 18 USC § 152(1), false oaths 18 USC § 152(2), false declarations or false statements under penalty of perjury 18 USC § 152(3), embezzlement form the estate of the debtor 18SC § 15, money laundering 18 USC § 1956 are predicate acts cognizable as racketeering unlawful activity under RICO 18 USC § 1961(1)(A)(B)(D) and ARS § 2301.D.4(b)(iv)Iv)(xx)(xv) that make this scheme.

404.　　After Scott King Corizon General Counsel submitted requests for pandemic related federal funds   for all venues that Corizon was

operating under During the period January 2020 through January 2021 Corizon obtained funds authorized by 12 USC 4703a; 15 USC 636; 15 USC 9001; 15 USC 9009a; 15 USC 9011; 15 USC 9051; 21 USC 21516; 22 USC 4801; 42 USC 234; 42 USC 603; 50 USC 4532; amongst others, for the 25 contracts cancelled.

405.     March 6, 2020 Nichole Cullen  sent emails from qpwblaw.com to Babich and Perkins at cch.com with copies to Gottfried and Carter directing them not to show me emails hat they send or receive. Copies were sent to bowwlaw.com Orm@teamcenturion and cch.com

406.     November 25, 2018 Dr. Rodney Stewart cch.com sent emails to all staff that they must make sure that the records when submitted pursuant to Parsons, are reconciled with the medical records, and if necessary the medical records changed.

407.     . May 6, 2018 Dr. Ayodeji Ladele sent emails to all staff directed not to prescribe inmates medication that is cost prohibitive or not to refer inmates for consultation.

408.     May 6, 2018 Dr. Ayodeji Ladele sent emails to all staff that they must change patient records in order to comply with Parsons. Conlon prepared declarations that contradicted these emals. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

409.     March 20, 2018 Robert Maldonado from cch.com sent emails that Corizon had altered the records required to be filed by Parsons.

410.     March 20, 2018 Marlene Bedoya from azadc.gov sent emails that records had been altered by Corizon. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

411.     December  2017 Dr. Fallhouse sent a email to Corizon corporate that he had delivered the altered reports pursuant to Parsons the ADCRR as directed by Corizon corporate.

412.     November 2017 Dr. David Robertson sent emails to Dr. Fallhouse that Corizon was altering reports and must stop. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

413.     November 2017 Specer Sego sent Corizon a email that he had changed the reports that Parson requires to comply with Parsons.

414.     October 2017 Dr. Fallhouse sent a email to Corizon corporate that he had delivered the altered reports pursuant to Parsons the ADCRR as directed by Corizon corporate.

415.     April 21, 2017 Dr. Michael Minev sent email to  Dr. Rodney Stewart cch.com  that he has changed the medical records to comply with the report submitted pursuant to Parsons, as requested

416. April 2017 FHA Porter sent altered reports required by Parsons to ADCRR and notified Corizon corporate.

417. March 21, 2016 Dr. Rodney Stewart cch.com sent emails to all staff that they must make sure that the records when submitted pursuant to Parsons, are reconciled with the medical records, and if necessary the medical records changed.

418. August 28, 2014 Dr. Winfred Willliams from ch.com sent emails to staff to ensure that staff change the records to coincide with the reports submitted under Parsons.. Conlon prepared a declaration contradicting the emails. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

419. March 4, 2014 Joseph Scott Conlon rcdmlaw. Com sent email to Dr. Dimitic Catsaros ch.comasking him to sign an affidavit that contradicted the emails sent by Catsaros when he was with Wexford health July 16,2012 where he was directed by Wexford change my treatment due to the cost. Catsaros executed the affidavit. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

420. September 2, 2013 Dr. Lucy Burciaga sent a email to staff to ensure that staff change the records to coincide with the reports

submitted under Parsons.. Conlon prepared a declaration contradicting the emails. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

421.     August 3, 2013 Dr. Kevin Lewis sent email to Dr. Joseph Moyse which directed him not to prescribe inmates medication that is cost prohibitive and if inmates die, Corizon will take care of it.

422.     July 23, 2013 Dr. Winfred Willliams from ch.com sent directives to all staff that they are not to provide treatment, referral to specialists and send inmates to hospitals, due to the cost of treatment. Conlon prepared a declaration contradicting the emails. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

423.     July 16, 2013 Weber Gallagher sent a email to Skelton Hochuli that training given to staff are to be released to inmates in discovery..

424.     June 26, 2013 NP Unger received a  email that directed him not to provide inmates with care that is expensive and not to refer inmates to specialists.

425.     February 3 2013  Mullenaux of Wexford sent emails to all staff that staff should just change reports required by Parsons to make it look good.

426.     January 14, 2013   Weber Gallagher sent a email to Skelton Hochuli that no policies by Wexford are to be released to inmates in discovery.

427.     January 4, 2013   Mullenaux of Wexford sent emails to all staff that inmates Wexford staff should not send inmates to hospital and in the event they die, Wexford will take care of it.

428.     October 6, 2012 Mullenaux of Wexford sent emails to all staff that inmates are not to be referred to specialists of provided essential treatment as the costs are exorbitant and Wexford s not getting paid much.

429.     September 9, 2012 Weber Gallagher sent a email to Skelton Hochuli that no documents adverse to Wexford are to be released to inmates in discovery.

430.     August 18, 2012 , May 21, 2013; and March 6, 2013 ADCRR informed Wexford by emails that Wexford should reexamine the reports as they appear falsified.

431.     November 9, 2007 Aurora Aguilar sent emails to Johnson and Meyers confirming that Ruobyaines  had destroyed my legal materials that I had asked to be copied. She confirmed that Ullibarri had

reviewed these, but she nevertheless shall deny my grievance. These were subsequently forwarded to Carter and Brodsky

## THE SCHEME TO PREVENT PRESENTATION OF EVIDENCE BY DEFENDANTS

432.    Retaliation against a witness 18 USC § 1513(e); false oaths    18 USC § 152; false claims 18 USC § 152; documents concealed/altered 18 USC § 1512(b)(1)(2)    are predicate acts cognizable as racketeering unlawful activity under RICO 18 USC § 1961(1)(A)(B)(D) and ARS § 2301.D.4(b)(iv)Iv)(xx)(xv) that make this scheme.

433.    Transcripts holding Ryan in contempt show that Magistrate Judge David Duncan found that Corizon supervisors instructed employees to alter the electronic records, to reflect inmates were receiving treatment, that they were not being given. ECF 2898 CIV 12-0601 (USDC ARIZ PARSONS v RYAN now SHINN v RYAN). This is the regular manner that Corizon operates in all venues.

434.    February 9, 2023 Loresca Purden directed after being told of the electronic evidence sent emails that I not be allowed to review the evidence, unless and until the librarian is present.

435.     October 6, 2022 Dalia Quintero after reviewing electronic evidence sent emails that I not be allowed to review the evidence, unless and until the librarian is present.

436.     March 6, 2020 Nichole Culllen  sent emails from qpwblaw.com to Babich and Perkins at cch.com with copies to Gottfried and Carter directing them not to show me emails hat they send or receive. Copies were sent to bowwlaw.com Orm@teamcenturion and cch.com

437.     May 28, 2019 Paul Carter sent a email  to Shelby Negron azadc.gov and asked her to execute a declaration that contradicted emails she sent to and received from Jose Ramos, Julia Erwin, Betty Ullibarri and Bohuszewicz.  Bohuszewicz.  Had directed her to destroy my legal materials, and mail CDS to Wexford, Corizon, Centurion, and their lawyers.  They contemplated the use of and did use the mail to accomplish this.

438.     April 6, 2019 Julia Erwin ADCRR sent emails to Kelly Dudley, Boschweicz explaining that Ullibarri had seized evidence against Correctional Health, Attorney general's Office and ADCRR employees on CDS. She explained these were sent to Wexford Corizon Centurion corporate offices and their lawyers, Carter and Gotttfried. She asked Dudley to draft a response for me.

439.     November 25, 2018 Dr. Rodney Stewart cch.com sent emails to all staff that they must make sure that the records when submitted pursuant to Parsons, are reconciled with the medical records, and if necessary the medical records changed.

440.     May 6, 2018 Dr.  Ayodeji Ladele sent emails to all staff directed not to prescribe inmates medication that is cost prohibitive or not to refer inmates for consultation.

441.     May 6, 2018 Dr.  Ayodeji Ladele sent emails to all staff that they must change patient records in order to comply with Parsons. Conlon prepared declarations that contradicted these emals. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

442.     March 20, 2018 Robert Maldonado from cch.com sent emails that Corizon had altered the records required to be filed by Parsons.

443.     March 20, 2018 Marlene Bedoya from azadc.gov sent emails that records had been altered by Corizon. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

444.     December  2017 Dr. Fallhouse sent a email to Corizon corporate that he had delivered the altered reports pursuant to Parsons the ADCRR as directed by Corizon corporate.

445.     November 2017 Dr. David Robertson sent emails to Dr. Fallhouse that Corizon was altering reports and must stop. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

446.     November 2017 Specer Sego sent Corizon a email that he had changed the reports that Parson requires to comply with Parsons.

447.     October 2017 Dr. Fallhouse sent a email to Corizon corporate that he had delivered the altered reports pursuant to Parsons the ADCRR as directed by Corizon corporate.

448.     September 28,  2017 Ryan sent emails to CEO Corizon that he was giving them $2,500,00 as bonus, so they would not cancel the contracts.  These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

449.     June 6, 2017 CEO of Corizon sent emails to Ryan azadc.gov that in the event Ryan did not increase the fees by 4% Corizon shall move from Arizona. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

450.     April 2017 FHA Porter sent altered reports required by Parsons to ADCRR and notified Corizon corporate.

451.     April 21, 2017 Dr. Michael Minev sent email to  Dr. Rodney Stewart cch.com   that he has changed the medical records to comply with the report submitted pursuant to Parsons, as requested.

452.     March 21, 2016 Dr. Rodney Stewart cch.com sent emails to all staff that they must make sure that the records when submitted pursuant to Parsons, are reconciled with the medical records, and if necessary the medical records changed.

453.     May 12 2015 CEO Corizon sent emails to Ryan azadc.gov that in the event Ryan fails to reduce the penalties imposed on Corzon, it shall move out of Arizona. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

454.     August 28, 2014  Dr. Winfred Willliams from ch.com sent emails to staff to ensure that staff change the records to coincide with the reports submitted under Parsons.. Conlon prepared a declaration contradicting the emails. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

455.     March 4, 2014 Joseph Scott Conlon rcdmlaw. Com sent email to Dr. Dimitic Catsaros ch.comasking him to sign an affidavit that contradicted the emails sent by Catsaros when he was with Wexford health July 16,2012 where he was directed by Wexford change my

treatment due to the cost. Catsaros executed the affidavit. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

456.    September 2, 2013 Dr. Lucy Burciaga sent a email to  staff to ensure that staff change the records to coincide with the reports submitted under Parsons.. Conlon prepared a declaration contradicting the emails. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

457.    August 3, 2013 Dr. Kevin Lewis sent email to Dr. Joseph Moyse which directed him not to prescribe inmates medication that is cost prohibitive and if inmates die, Corizon will take care of it.

458.    July 23, 2013 Dr. Winfred Willliams from ch.com sent directives to all staff that they are not to provide treatment, referral to specialists and send inmates to hospitals, due to the cost of treatment. Conlon prepared a declaration contradicting the emails. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

459.    June 26, 2013 NP Unger received a  email that directed him not to provide inmates with care that is expensive and not to refer inmates to specialists.

460.     November 29, 2010 Gene Greeley sent emails to Carter that no matter what the reason, as I have been challenging the presentation of false evidence by Attorney general's Office my diet should be cancelled.

461.     February 20, 2009 Shelly Sonberg sent a email to Greg Fizer that upon discussions with Michael Brodsky and Paul Carter the decisions made in my favor reconstructing the records, were set aside, and I should sue if I wish to.

462.     December 14, 2007 Cheryl Dossett directed Tara Diaz to prepare documents that I was not sent o segregation, for complaining about the killing of an inmate, in case, take this to court.

463.     November 9, 2007 Aurora Aguilar sent emails to Johnson and Meyers confirming that Ruobyaines had destroyed my legal materials that I had asked to be copied. She confirmed that Ullibarri had reviewed these, but she nevertheless shall deny my grievance. These were subsequently forwarded to Carter and Brodsky

464.     December 18, 2006 Aurora Aguilar sent emails to Byron Tucker that the documents forged at the request of Paul Carter should be labelled amended.

465.     December 12, 1999 Aurora Aguilar directed Byron Tucker to prepare documents that Sgt. Lance Uehlling did not ask sin heads to beat me up, just in case, I take it to court.

466.     September 3, 1999 Sgt. Donaldson sent email to Daryl Graves stating she had found nine legal boxes of documents, but they have been removed from a secure area by staff.

467.     August 31, 1999 Daryl Graves ADOC sent emails to Cindy Neese that the property and legal materials had been intentionally destroyed upon orders of central office. Copies were sent to Christopher Copple.

468.     Defendants , implemented these directives,        pursuant to cooperation agreements and  continued with the scheme. They  gave tacit authorization to the misconduct and failed to take remedial actions, when informed,  thereby causing the misconduct.

469.     Without   knowing what the Jensen injunction would be, Naphcare, like Wexford, Corizon and Centurion signed the contract to comply with the prospective conjunction, further informing the court that  Techcare,  the  software  it  uses  shall  maintain  proper contemporaneous record of care given.

470.     Continuing with the practices implemented by Wexford, Corizon and Centurion, Naphcare has Techcare where records made by nurses

and providers vanish, and the reports submitted by the permanent injunction in Jensen are altered to appear they comply with ECF 4410 in Jensen, but they do not.

471.    In violation of HIPPA, all inmates can from their tablets access medical records of any inmate, as long as they have their information.

472.    EMAILS from ADCRR, Naphcare and Dr. Pachecho are and were sent to change treatment that the providers order and these documents appear nowhere in these records, because these emails appear nowhere in the inmate medical records, same as in the case of Wexford, Corizon, Centurion.

473.    Pursuant to the litigation strategy adopted outside the adversarial process, to conceal and falsify evidence in prisoner litigation,, Struck and the Struck Law firm, Carter, Morrrissey, Thornell, aware of these actions, continue to conceal these from the courts, thereby as a consequence of their spoliation activities, they denied me denying me the chance to have my claims heard by the courts.

## THE PRACTICES OF LIABILITY INSURERS

474.  Liability Insurers for Defendants are aware of these practices that I set forth in this complaint, and have failed to take actions, mandated by their policies. They have provided performance bonds and liability insurance, have breached the covenant of good faith and fair dealing, fiduciary duty, and engaged in bad faith settlement practices. Liability Insurers have put in place the practice, in violation of law, which forces litigation, in prisoner cases, as in this case.

475.  By omission Liability Insurers have misrepresented facts and policy provisions. They have failed to, as mandated by law, in prisoner cases, to acknowledge and promptly act on all claims. Liability Insurers fail to follow reasonable standards, standards followed by the insurance community in all cases, for investigation of claims. Liability Insurers deny claims without reasonable investigation.

476.  Liability Insurers compel prisoners to litigate issues, and fail to follow their own rules and regulations, internal policies and guidelines.

477.    Liability Insurers  are required to investigate facts and the law, as if there were no policy limits.

478.    In prisoner cases, , these Liability Insurers  aided and abetted in the prefabrication of defenses and bad faith use of procedural devices, as set forth in the complaint.

## THE PATTERN OF RACKETEERING ACTIVITY

479.    During the relevant times, the Defendants and participants (hereinafter "Defendants") conspired with one another to defraud me, Correctional Health and others. As part of their scheme or artifice to defraud Defendants diverted these funds by corrupting their chief financial officers, and through such corruption gained their assistance to perpetrate the fraud. The did this to the detriment of Corizon, Wexford, Centurion, Naphcare and myself, and they had no right to these funds. The multifarious racketeering activities unlawful activities through which these broad objectives of the Defendants and participants were carried out consisted of a complex pattern of individual transactions and group of transactions.

480.    It was a part of the scheme that Defendants and others would and did agree to conspire together with the others to devise and participate in a plan of deceit and deception, whereby they would and

did abuse their positions of trust and fiduciary relationships with the Corrections Health enterprise.

481.    Defendants and participants did and would abuse the discretion granted to them, and did breach their obligations of loyalty and fidelity and their duty to act honestly and faithfully in the best interests of Corrections Health and not for their own self interests. They would and did use false and fraudulent pretenses , representations, and promises calculated to deceive persons of ordinary prudence and care, and make material non disclosures, and concealment if fact and important to Correctional Health in deciding whether to act in the conduct of its affairs, all so as to unlawfully, intentionally and willfully and with the intent to defraud, that is, knowingly and with the specific intent to deceive, in order to get financial gain to themselves, procure secret profits, and divert the assets of Correctional Health to the use and detriment of Correctional Health, me and others.

482.    That scheme to defraud evolved over time as a pattern of unlawful racketeering activities and inflicted distinct harm on e and others.

483.    In carrying out the transactions to defraud Correctional Health Defendants engaged in, inter alia, conduct that violates federal and state law.

484.    Defendants authorized, requested, commanded, ratified recklessly tolerated the unlawful conduct of the other. The directors, high management, agents, performed, authorized, requested, commanded, ratified or recklessly tolerated the unlawful conduct as proscribed by ARS 13-2314.04.E and 13-2301.D.9

485.    These acts are related to each other, or to a common external organizing principle, including the affairs of the Correctional Health enterprise. They have same or similar purposes, results, participants, or victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics. They are continuous, or exhibit the threat of being continuous.

486.    These acts or activities were authorized, requested, commanded, ratified or recklessly tolerated by the unlawful or racketeering conduct of the other. The directors, higher management, agents performed, authorized, requested, commanded, ratified or recklessly tolerated the unlawful conduct of the agents.

487.     When Defendants obtained signatures by deception with the intent to defraud by knowingly misrepresenting or mitting fact material to the transactions in the declaration(s), they committed forgery proscribed and prohibited by ARS 13-2005.A, as set forth in the unlawful conduct predicate acts. The actual intent was to obstruct justice, in a manner that is likely to obstruct justice, interfere with the administration of justice, with specific intent to corruptly influence, obstruct or impede justice, or the due administration of justice.

## FIRST CLAIM FOR RELIEF

## Violation of 18 USC 1962(c); ARS 13-2314.04

488.     Tripati here repeats the allegations in paragraphs 1 through 487..

489.     Defendants, and each of them are persons within the meaning of 18 USC 1961(3), 1964(c), ARS 105.30, capable of holding legal and or beneficial interesting property.

490.     Correctional Health is an associated in fact enterprise within the meaning of 18 USC 1961(4); 1962(c); ARS 105.17; 13-2314.04, which enterprise was engaged in and the activities of which affect interstate commerce, during all relevant times.

491.    Defendants are each employed by or associated with an enterprise, the Correctional Health enterprise, and did conduct or participate, directly or indirectly, in the conduct of the affairs of the Correctional Health enterprise, through a pattern of unlawful racketeering activity within the meaning of 18 USC 1961(1)(B), 1962(D), 1961(5), 1962(c), ARS 13-2314.04

492.    Defendants aided and abetted , and solicited each other to conspire, or attempt to violate 18 USC 1962(d), ARS 23-1002.A.C to violate 18 USC 1964(c), ARS 13-2314.04, as proscribed by ARS 13-1001.A; 1002.A

493.    By reason of the violation of 18 USC 1962(d), ARS 13-2314.04, by Defendants I have been injured in an as yet undetermined amount, believed to be not less than approximately $30,000,000 within the meaning of 18 USC 1964(c) and ARS 13-2314.04

494.    During all times the enterprise Correctional Health, made of Valitas Intermediate Holdings Incorporated, a Delaware Corporation; M2 HoldCo LLC, a Florida Limited Liability Co; M2 LoanCo LLC, a Florida Limited Liability Co; M2 EquityCo LLC, a Florida Limited Liability Co; Becken Petty O'Keefe, a Delaware Corporation and

Liability Insurers, was engaged in interstate commerce, in that the enterprise acquired, financed Corizon's services all around the nation.

495.    As Defendants knew that the assets of the correctional health enterprise and Debtor, involved in the financial transactions, represented some form of unlawful activity, by conducing or attempting to conduct the financial transactions, which I fact involves some form of unlawful activity, as set forth in the complaint, with the intent to carrying on the unlawful activity, they engaged in conduct proscribed by 18 USC 1956(a)(A)i(1)

496.    By knowingly that the transaction was designed in whole or part to conceal or disguise the nature or control of proceeds of the specified unlawful activity, or to avoid the transaction reporting requirements under state and federal law, Defendants engaged in conduct proscribed b 18 USC 1956a(B)(1)(II)

497.    Defendants maintained illegal control of the Correctional Heath enterprise when they, through racketeering unlawful acts activities, or its proceeds, acquired or maintained, by investment or otherwise, control of the Correctional Health enterprise. Defendants conducted illegally conducting an enterprise, when they, employed by or associated with Correctional Health enterprise,, conducted its affairs

through racketeering unlawful acts activities, or participated directly and or indirectly, in the conduct of the affairs of the Correctional Health enterprise, with knowledge that it is conducted through racketeering unlawful acts activities, proscribed by ARS 13-2312.A.B

498.   Tripati has sustained reasonably foreseeable injury to his person, property by a pattern of racketeering activities or acts by violation of ARS 13-2312 involving a pattern of racketeering or unlawful activities.

499.   Defendants are each employed biro associated with an enterprise, the Correctional Health enterprise, and did conduct or participate, directly or indirectly, in the conduct of the affairs of the Correctional Health enterprise, through a pattern of unlawful racketeering activity within the meaning of 18 USC 1961(1)(B), 1962(D), 1961(5), 1962(c), ARS 13-2314.04.

500.   Defendants Corizon, Wexford, Centurion, Naphcare, Shinn, Ryan entered into cooperation agreements with each other thereby were each by virtue of these cooperation agreements, employed by or associated with an enterprise, the Correction Health enterprise, and did conduct or participate, directly or indirectly, in the conduct of the affairs of the correctional Health enterprise, through a pattern of

unlawful racketeering activity within the meaning of 18 USC 1961(1)(B), 1962₢, 1961(5), 1962(c), ARS 13-2314.04, ARS 13-2301.D.1

501.    By reason of the violation of 18 USC 1962©, ARS 13-2314.04 by Defendants, and each of them, Tripati and Correctional Health has been injured in an yet undetermined amount, believed to be no less than $30,000,000 within the meaning of 18 USC 1964(c) and ARS 13-2314.04

## SECOND CLAIM FOR RELIEF
## Violation of 18 USC 1962(d); ARS 13-2314.04 by Conspiracy to Violate 18 USC 1962(c) and ARS 13-2314.04

502.    Tripati here repeats the allegations in paragraphs 1 through 501.

503.    Defendants, and each of them are persons within the meaning of 18 USC 1961(3), 1964(c), ARS 105.30, capable of holding legal and or beneficial interesting property.

504.    Correctional Health is an associated in fact enterprise within the meaning of 18 USC 1961(4); 1962(c); ARS 105.17; 13-2314.04, which enterprise was engaged in and the activities of which affect interstate commerce, during all relevant times.

505.    Defendants Corizon, Wexford, Centurion, Naphcare, Shinn, Ryan entered into cooperation agreements with each other thereby were

each by virtue of these cooperation agreements, employed by or associated with an enterprise, the Correction Health enterprise, and did conduct or participate, directly or indirectly, in the conduct of the affairs of the correctional Health enterprise, through a pattern of unlawful racketeering activity within the meaning of 18 USC 1961(1)(B), 1962€, 1961(5), 1962(c), ARS 13-2314.04, ARS 13-2301.D.1

506.    Defendants are each employed by or associated with an enterprise, the Correctional Health enterprise, conspired within the meaning of 18 USC 1962(d), ARS 13-1003.A to violate 18 USC 1964(c), ARS 13-2314.04 that is, said Defendants did conspire, directly or indirectly,  in the conduct of the affairs of the Correctional Health enterprise, through a pattern of unlawful racketeering activity within the meaning of 18 USC 1961(1)(B), 1962(D), 1961(5), 1962(c), ARS 13-2314.04

507.    Defendants maintained illegal control of the Correctional Health enterprise when they, through racketeering unlawful acts activities, or its proceeds, acquired or maintained, by investment or otherwise, control of the Correctional Health enterprise.

508.    Defendants conducted illegally conducting an enterprise, when they, employed by or associated with Correctional Health with

Correctional Health enterprise, conducted its affairs through racketeering unlawful acts activities proscribed by ARS 13-2312.A.B

509.     Defendants aided and abetted , and solicited each other to conspire, or attempt to violate 18 USC 1962(d), ARS 23-1002.A.C to violate 18 USC 1964(c), ARS 13-2314.04, as proscribed by ARS 13-1001.A; 1002.A

510.     During all times the enterprise Correctional Health, made of Valitas Intermediate Holdings Incorporated, a Delaware Corporation; M2 HoldCo LLC, a Florida Limited Liability Co; M2 LoanCo LLC, a Florida Limited Liability Co; M2 EquityCo LLC, a Florida Limited Liability Co; Becken Petty O'Keefe, a Delaware Corporation and Liability Insurers, was engaged in interstate commerce, in that the enterprise acquired, financed Corizon's services all around the nation.

511.     As Defendants knew that the assets of the correctional health enterprise and Debtor, involved in the financial transactions, represented some form of unlawful activity, by conducing or attempting to conduct the financial transactions, which I fact involves some form of unlawful activity, as set forth in the complaint, with the intent to carrying on the unlawful activity, they engaged in conduct proscribed by 18 USC 1956(a)(A)i(1)

512.    By knowingly that the transaction was designed in whole or part to conceal or disguise the nature or control of proceeds of the specified unlawful activity, or to avoid the transaction reporting requirements under state and federal law, Defendants engaged in conduct proscribed b 18 USC 1956a(B)(1)(II)

513.    Tripati has sustained reasonably foreseeable injury to his person, property by a pattern of racketeering activities or acts by violation of ARS 13-2312 involving a pattern of racketeering or unlawful activities.

514.    By reason of the violation of 18 USC 1962(c), ARS 13-2314.04 by Defendants, and each of them, Tripati and Correctional Health has been injured in an yet undetermined amount, believed to be no less than $30,000,000 within the meaning of 18 USC 1964(c) and ARS 13-2314.04

515.    By reason of the violation of 18 USC 1962(d), ARS 13-2314.04, by Defendants I have been injured in an as yet undetermined amount, believed to be not less than approximately $30,000,000 within the meaning of 18 USC 1964(c) and ARS 13-2314.04

## THIRD CLAIM FOR RELIEF

## (Declaratory Judgment And Other Relief )

516.    Tripati here repeats the allegations in paragraphs 1 through 515.

517.    Defendants in advance of litigation, as a matter of their practice and policy, engineered the scheme to deploy prefabricated defenses in prisoner litigation. They used permissible procedural devises in bad faith, rigging the game from inception. They ensured truthful untainted evidence is not disclosed if inculpatory and favorable to inmates.    They    created    alternative    evidence/facts,    not mischaracterizing them. They assembled template stock pleadings, making false sworn/unsworn statements, providing false incorrect expert/consultant reports, creating false exonerating evidence.

518.    Pursuant to  foregoing they intentionally destroyed, withheld the foregoing material evidence duty bound to disclose, that prisoners like me cannot obtain from alternative sources. These are reports, emails, investigations, faxes, employee misconduct reports, policies, directives, failure to follow policies, and the evidence discussed   above.

519.    Defendants made material misrepresentations as to past and current facts/policies/directives, with knowledge or belief of their falsity, with an intention that courts and inmates shall rely on. Both the courts and I relied, and on which there was reasonable reliance by

courts and inmates. They lied and concealed the evidence violating fraudulent concealment, fraud, deceit. Their conduct constitutes common law fraud, deceit, fraudulent concealment, constructive fraud, constructive taking, unjust enrichment, breach of fiduciary duty, deceptive business practices, fraud upon the court, and conspiracy to engage in these torts. Their conduct also is a violation of my right of access to courts, as they, by filing this bankruptcy, [prevented the United States Supreme Court, Third, Ninth and Arizona federal courts from reviewing my claims on spoliation. I would have prevailed had they not filed this bankruptcy, and allowed the courts, to review my claims.

520.    Defendants  had a legal obligation to disclose the evidence in connection with existing or pending litigation. They did not disclose material evidence, intentionally withholding, altering, destroying the evidence to disrupt frustrate prisoner litigation. As consequence the evidential record did not contain the relevant evidence.

521.    Tripati seeks Declaratory judgment that this bankruptcy proceedings do not bar claims for spoliation of evidence by Tripati, and that the bankruptcy proceedings were filed to defraud Tripati and other victims of spoliation.

522.     Tripati further seek additional declaratory judgment that the Defendants breached their fiduciary duties as to Tripati, by engaging in spoliation and then using the bankruptcy process to prevent its adjudication.

523.     Tripati further seek additional declaratory judgment that the Defendants conducting supervisory liability using the bankruptcy process to prevent its adjudication.

## **PRAYER FOR RELIEF**

1. As a consequence of the spoliation of evidence, my claims in CIV 11-0195; 18-00666; 13-0140; 13-0615; in District of Arizona were not decided with all the evidence.

2. I ask that judgment be entered against Defendants , jointly and severally, and in my favor.

3. I ask that damages be awarded in an undetermined amount, no less than $30,000,000 upon the first claim  for relief for violation of 18 USC 1962(c), and the sum trebled for violation of 18 USC 1964(c).

4. I ask that damages be awarded in an undetermined amount, no less than $30,000,000 upon the first claim  for relief for violation of ARS 13-2314.04 , and the sum trebled for violation of  ARS 13-2314.04.

5. I ask that damages be awarded in an undetermined amount, no less than $30,000,000 upon the second claim  for relief for violation of 18 USC 1962(d), and the sum trebled for violation of 18 USC 1964(c).

6. I ask that damages be awarded in an undetermined amount, no less than $30,000,000 upon the second claim  for relief for violation of ARS 13-2314.04 , and the sum trebled for violation of  ARS 13-2314.04.

7. I am asking that these Chapter 11 proceedings be dismissed, actual and punitive damages, treble damages be awarded, constructive trust with tracing be appointed, equitable liens be placed, fraudulent transfers be nullified, restrictions on future conduct be imposed, relief be afforded for fraudulent conveyance, fraud, deceit, accounting, a jury trial, costs, fees and other relief be awarded.

8. I ask that employees who were deprived the fund for pandemic relief be awarded those funds.

Respectfully submitted this 30th day of April 2023 and sworn under the penalty of perjury as being true and correct.

## COMPLIANCE WITH RULE 11

1. The matters that I assert in this verified complaint are well grounded in facts and warranted by existing law. There is good faith argument for the extension, modification, or reversal of existing law.

2. Before I filed this complaint, I contacted counsel, to meet and confer. I attempted to comply with BR 9011.

3. These matters have not been asserted in bad faith. They are not made for vexatious, wanton, improper, or oppressive reasons.

4. They are not designed to harass, to create unnecessary delay, to impose a needless increase in the cost of litigation, or to force an unjust settlement through the serious character of these averments.

5. The activities of the Defendants in the formation and execution of the scheme to defraud Had a pervasive, debilitating, ultimately fatal impact on Corizon's  effort to function as a prison healthcare provider, as well as my litigation against Defendants, due to spoliation.

6. Assets were not only diverted, but were not available for use by `Corizon.

7. Because of this Corizon failed.

8. In connection with the activities giving rise to this action, the Defendants acted with malice, insult, intent and knowledge, and with a wanton and reckless disregard of the rights of Corizon and myself.

9. The complaint alleges, inter alia, violations under the Organized Crime Control  Act of 1970, Public Law 91-452, Section 901(a), 84 Stat 941, Racketeer Influenced Corrupt Organizations (RICO), and is brought by

me, in connection with as scheme devised, conducted, and/or participated by Defendants, each of whom was employed by or associated with the Correctional Health enterprise, through a pattern of racketeering unlawful activity, and to conspire to do so, and to wrongfully and unlawfully divert assets of Correctional Health, and to conspire to do so, all to my detriment.

Anant Kumar Tripati 102081
Arizona State Prison
P.O.Box 8909
Yuma Arizona 85349

Proof of service

Copies mailed to
Jason S. Brookner, Esq
Gray Reed & McGraw LLP
1601 Elm Street # 4600
Dallas, Texas 75201